UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | 05-CR-836 |
| – against – | Statement of Reasons Pursuant to 18 U.S.C. § 3553(c)(2) for Violation of Supervised Release |
| ANDREW ILAYAYEV, | |
| Defendant. | |
| Violation of Supervised Release | |
| | |
| UNITED STATES OF AMERICA | 10-CR-361 |
| – against – | Statement of Reasons Pursuant to 18 U.S.C. § 3553(c)(2) for Sentence |
| LIOR HANUKA, | |
| Defendant. | |
| Sentence | |

**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I.    Introduction ........................................................................................................... 4

II.   Facts ....................................................................................................................... 7

   A.  Lior Hanuka—Genesis in Appropriate Medical Prescriptions ........................... 7

      i.    Personal History ........................................................................................... 7

      ii.   Accident and Treatment ................................................................................ 8

      iii.  Addiction, Crime, and Arrest ...................................................................... 10

1

iv.   Post-Arrest Rehabilitation ................................................................ 12

B.   Andrew Ilayayev—Genesis in Illegal Social Use ................................. 13

   i.   Personal History ............................................................................... 13

   ii.   History of Drug Use ......................................................................... 14

   iii.   Original Offense and Sentence ........................................................ 15

   iv.   Charged Violations of Supervised Release ..................................... 15

   v.   Plea and Continuing Drug Use ........................................................ 17

III.   Oxycodone and OxyContin—Properties and Effects ............................... 18

IV.   Prevalence of Oxycodone and OxyContin Abuse ...................................... 21

A.   Background Contributors to Abuse ......................................................... 21

B.   Oxycodone and OxyContin Abuse: Who, Where, and Impact .............. 24

C.   Sources of Illicit Oxycodone and OxyContin ....................................... 28

V.   The Medical Community's Obligations in Relation to Oxycodone and OxyContin

Prescribing ...................................................................................................... 30

A.   Pressures Placed on Physicians in Prescribing ...................................... 30

B.   Physicians' Obligations in Prescribing .................................................. 35

C.   Physicians Who Fail to Satisfy Their Obligations ................................ 43

D.   Legal Consequences for Physicians Who Fail to Satisfy Their Obligations ..................... 46

E.   Pressures Placed on Pharmacists in Filling Prescriptions .................... 47

F.   Pharmacists' Legal Obligations in Filling Prescriptions ...................... 49

G.  Medical Community's Response to Addiction ................................................................. 51

VI.  Government Regulation of Oxycodone and OxyContin Prescribing ..................................... 51

A.  Federal Government Regulation ........................................................................... 51

B.  State Government Regulation ............................................................................. 54

VII. Sentences Imposed ................................................................................................... 57

A.  Sentencing Rules ............................................................................................ 57

B.  Hanuka's Sentence .......................................................................................... 58

C.  Ilayayev's Sentence ......................................................................................... 60

VIII. Conclusion ............................................................................................................. 63

## I.     Introduction

These two sentences raise the profoundly troubling question of how to sentence young defendants whose addiction lead to violation of criminal drug laws.  One of the defendants—Lior Hanuka—fell into addiction after a drug was prescribed lawfully, and with medical justification, for pain caused by injuries in an auto accident.  The other—Andrew Ilayayev—used drugs for personal gratification and pleasure, with abuse turning into addiction.

For Hanuka, the drug was oxycodone, a powerful medication used to alleviate severe pain, to provide succor to those suffering physical distress as a result of disease or trauma.  It is much abused.  *See, e.g.*, Theodore J. Cicero et al., *Trends in Abuse of OxyContin and Other Opioid Analgesics in the Unites States: 2002-2004*, 6 J. Pain 662 (2005).

For Ilayayev, the drugs are many, including ecstasy, PCP, Special K, cocaine, and heroin. These drugs are exclusively recreational, having no recognized medical purpose.  They are much abused. *See* Nat'l Drug Intelligence Ctr., U.S. Dep't of Justice, *National Drug Threat Assessment 2010*, 32–35, 40–41 (2010) [hereinafter NDIC 2010 Report].

This memorandum and order concentrates on oxycodone because its use illustrates the need for cooperation between the medical and legal professions <u>to avoid abuse and addiction</u>. Abuse of recreational, non-prescription drugs like ecstasy, PCP, and Special K usually requires cooperation between the law and medicine <u>after addiction and criminal conduct</u> has resulted; cases related to those drugs and the need for curative treatment are usually dealt with in sentencing and violations of probation and supervised release; dangers of those drugs are well known to courts and hospitals.

Modern medicine has utilized pain relieving drugs and anesthesia with great benefit to mankind.  *Cf., e.g.*, David McCullough, *The Greater Journey: Americans in Paris* 133 (2011)

(describing the first operation performed in which ether was used as an anesthetic). Sometimes physicians' experiments in healing have gone awry as substances they utilized have been abused. *Cf., e.g.*, Howard Markel, *An Anatomy of Addiction: Sigmund Freud, William Halsted, and the Miracle Drug Cocaine* 90, 97–98 (2011) (doctors Sigmund Freud and William Halsted used, and mistakenly concluded that cocaine is a useful psychotropic drug, but only the latter became addicted). Large numbers of new drugs developed and manufactured for non-medical purposes have been abused by those seeking pleasure, to their own severe detriment and that of society. *Cf., e.g.*, Abby Goodnough & Katie Zezima, *An Alarming New Stimulant, Sold Legally in Many States*, N.Y. Times, July 17, 2011, at A1 (describing the rise of "bath salts" as a drug of abuse, with startling permanent adverse consequences on the mind).

Such substances as cocaine were widely used in this country in soft drinks, and morphine and its derivatives were available in over-the-counter medications. Markel, *supra*, at 58–59. With the passage of the Federal Controlled Substances Act ("CSA") in 1970, and earlier legislation, distribution of narcotics came under closer federal regulation. No longer could manufacturers of consumer products incorporate those drugs in their products and sell them freely in grocery stores and pharmacies throughout the nation. The criminal law as a method of control was enhanced. For narcotics with recognized medical uses, licensed physicians and pharmacists now stood as gatekeepers, acting as their sole authorized source.

The drug abused by Hanuka, oxycodone, is among controlled substances with a recognized medical use. Patients may obtain it legitimately only with a valid prescription from a properly-licensed physician filled through a licensed pharmacy.

The drugs abused by Ilayayev are also closely regulated under the CSA. In contrast to oxycodone, however, the medical community plays little or no role in controlling access to such

illegal drugs because they lack approved medical uses. Criminal law enforced by federal and state government acts as the primary means to control their distribution.

The circumstances of Hanuka's case emphasize the importance of cooperation between the medical community and law enforcement in controlling abuse of dangerous but useful substances such as narcotic painkillers. Physicians' and pharmacists' combined ethical and legal obligations in regard to distributing such pharmaceuticals can provide substantial protection against their abuse. Nevertheless, the physicians and pharmacists may themselves contribute to abuse, necessitating intervention by law enforcement. Although complicated, a working relationship between the medical community and law enforcement is essential to realizing the potential benefit that these substances hold for patients suffering from severe or chronic pain while avoiding their deleterious effects on society from rampant abuse and addiction.

No such relationship between law and medicine geared toward preventing abuse exists for the drugs involved in Ilayayev's case. Prevention is within the ambit of law enforcement, with less direct involvement from medical professionals. The medical profession usually becomes involved with law enforcement only at the abuse and treatment stages. This relationship is exemplified by the recent rise in specialized drug treatment courts such as special parts for treatment, like the STAR Court in the Federal District Court for the Eastern District of New York, in which Ilayayev was given the opportunity to participate, but from which he did not benefit.

## II.     Facts

### A.     Lior Hanuka—Genesis in Appropriate Medical Prescriptions

#### i.     Personal History

Hanuka was born in Brooklyn on February 6, 1987.  Presentence Investigation Report of Lior Hanuka ("Hanuka PSR") ¶ 35.  His parents are married and reside in Staten Island, where his father co-owns a successful contracting business, and his mother operates a beauty salon.  *Id.*; Tr. of Sent'g of Lior Hanuka 10:4–6 (June 21, 2011) ("Hanuka Tr.").  Twenty-four years old, he is the youngest of three brothers.  One brother, who co-owns the contracting business with their father, Hanuka PSR ¶ 35, lives in Staten Island with his wife and two children.  *Id.* ¶ 36.  The other lives in an apartment in their parents' home and owns a gold and jewelry store in Brooklyn. *Id.*  Hanuka is himself unmarried and has no children.  *Id.* ¶ 38.

Hanuka was raised in a favorable environment unlike those commonly associated with deprived drug defendants.  *See, e.g.*, *United States v. Bannister*, --- F. Supp. 2d ---, 2011 WL 1361539 (E.D.N.Y. Apr. 8, 2011).  He had a middle-class upbringing in Staten Island, where he resided until 2010, by hard-working parents who were married and lived together in one home. *Id.* ¶¶ 37, 39.  There was apparently no physical, emotional, or substance abuse of any kind in that home.  *Id.*  Hanuka's own lack of substance abuse during his adolescent years is attributed by him to the influence of his older brothers, who he says would "never allow it."  *Id.* ¶ 46.  His relationship with his family was, and still is, close, *id.* ¶ 37; for this, he considers himself "lucky," *id.*

Deciding to go to work in a cellular telephone business at the time owned by his brother, Hanuka withdrew from high school when he was sixteen and in the tenth grade.  *Id.* ¶¶ 50, 54. Permission from his parents to withdraw was conditioned on his later obtaining a GED, *id.*,

which he did in 2005, *id.* ¶ 51. He worked in the cell phone business for several years. In 2007, he began working on and off for his family's contracting company, where his responsibilities included managing the company's finances. *Id.* ¶ 53. Approximately two years after passing his GED exam in 2007 he enrolled in the College of Staten Island. *Id.* ¶ 49. Between 2007 and 2008, he completed fifteen credits. *Id.*

### ii. Accident and Treatment

In 2005, when Hanuka was eighteen years old, he was involved in a serious car accident injuring his back. Hanuka PSR ¶ 44. Reduced pain from that injury persists. Hanuka Tr. 16:13–20 (explaining that his back still produces a burning sensation if he sits too long).

Eventually Hanuka was driven to seek medical relief. He consulted with his regular physician, a general practitioner in Staten Island, in mid-2007. *See id.* ¶ 8. This physician did not prescribe the oxycodone he would eventually take for his pain. Hanuka Tr. 21:13–22. Instead, the doctor referred Hanuka to a pain specialist who prescribed oxycodone. *Id.*; *id.* at 19:20–21. Hanuka never returned to his regular physician for additional consultations or treatment, *id.* 21:16–22, and this doctor never followed up on the injury or on any subsequent treatment.

After the first referral, Hanuka began to receive treatment from several physicians. *See* Hanuka PSR ¶¶ 7–10; Hanuka Tr. 20:2–4; *id.* at 24:13–15. The Probation Department's presentence report details government interviews with two of those practitioners. *See* Hanuka PSR ¶¶ 7–10. What is obvious is that Hanuka began to receive simultaneous treatment for his back pain in the form of prescriptions for oxycodone from more than one medical office. *See* Hanuka PSR ¶¶ 7–10; *see also* Hanuka Tr. 20:14–17 ("Q: Well, did you tell the new doctors that gave you the additional prescriptions that you were under treatment from the first doctor? A:

No, I did not, your Honor."); *id.* at 24:13–15 (statement of probation officer) ("The defendant saw several physicians and a physician's assistant to obtain prescriptions during the time period charged . . . .").

One physician interviewed by the government first saw Hanuka in late 2007 and continued to provide treatment for back pain until June 2010. Hanuka PSR ¶ 8. Before prescribing any medication, this physician sent Hanuka for an x-ray and MRI. *Id.*; Hanuka Tr. 15:9–10. The results of the MRI confirmed the existence of Hanuka's back injury. Hanuka Tr. 15:10–12. Presumably satisfied that Hanuka's pain was legitimate, the physician then prescribed oxycodone. *See* Hanuka PSR ¶ 8. On subsequent visits to this doctor's office, Hanuka was required to submit to a urinalysis test as a prerequisite to receiving an additional oxycodone prescription. *Id.* The purpose of the urinalysis was to determine whether the oxycodone level in Hanuka's blood was within a "therapeutic range" and did not suggest possible abuse of the drug. *Id.* Hanuka reports that he complied with the tests until his last visit, in June 2010, when he refused to submit to them. *See id.* ¶¶ 8–9. The physician confirmed that four oxycodone prescriptions for a total of 720 thirty milligram pills were issued to Hanuka between February 2, 2010, and May 5, 2010. *Id.* ¶ 9. No confirmation was provided, however, for possible prescriptions issued before February 2, 2010.

The second physician interviewed by the government treated Hanuka for back pain from October 2008 until May 2010. *Id.* ¶ 10. This doctor did not require Hanuka to undergo an x-ray or MRI before prescribing oxycodone, instead relying on the results of the prior MRI to confirm the back injury. *Id.* Hanuka received his prescriptions for oxycodone from this second physician on a regular schedule. Every ninety days the physician would see Hanuka for a personal consultation, *id.* 21:4–6, but he would issue oxycodone prescriptions to the patient on a monthly

basis. *Id.* 20:22–24; *id.* 21:8–10. Hanuka claims that the prescriptions would always be waiting for him to be picked up at the secretary's desk in the physician's office. *Id.* 21:8–10. The physician claims to have had a policy that required patients to pick up each prescription in person and to provide proof of identity. Hanuka PSR ¶ 10. Hanuka's and the physician's respective claims are not necessarily incompatible. The last time Hanuka came to collect a prescription from the physician's office was in May 2010. *Id.* In total, this physician issued sixteen prescriptions for Roxicodone, a brand name formulation of oxycodone, equating to 2,800 thirty milligram pills. *Id.*

According to Hanuka, none of physicians he visited warned him of the addictive qualities of oxycodone. *See* 20:18–21:15. Nor was he told of the dangers by the pharmacists who filled his prescriptions. *Id.* at 23:18–23. The pharmacists would call the prescribing physician to verify that Hanuka's prescription was valid, but do nothing more. *Id.* The insert that came with each prescription did, however, provide warning of the dangers of the medication. *Id.* at 23:24–24:2.

### iii. Addiction, Crime, and Arrest

At first, Hanuka took the prescribed dosage of six pills per day for his back pain. Hanuka PSR ¶ 47. As time went on and his brain grew accustomed to the medication, the prescribed dosage became less and less effective, prompting him to begin taking, without a physician's advice, twice the number of prescribed pills to achieve the same degree of relief. *See id.*

With this self-medicated increase in daily dosage, Hanuka's addiction to oxycodone began. *Id.* The effects of withdrawal were acute: "[L]et's say you wake up one morning and you don't take [a pill], your body goes through physical withdrawal and your legs shake, [you get] the sweats. It's basically like pneumonia." Hanuka Tr. 20:7–8. And, as his addiction

progressed, avoiding withdrawal became more and more difficult. Said Hanuka, "[i]nstead of one pill at a time, [I] needed two pills at a time, then three pills at a time, then four pills at a time, and if [I] didn't have it [I] got sick [and] all's [I] want to do is get another pill to feel better." *Id.* at 20:9–13. Eventually, he was under the constant influence of the drug, moving about his days in a drug-addled haze. *See id.* at 17:22–24 ("I was high twenty-four hours a day seven days a week. I was just in a fog, in a daze.").

The drug took control of his life. Predictably it began to unravel. Hanuka PSR ¶ 47; Hanuka Tr. 17:8–10. In 2008, he dropped out of school, withdrawing from all classes at the College of Staten Island. Hanuka PSR ¶ 49; *see also* Hanuka Tr. 17:9. Worse, he began to support his expensive addiction by selling oxycodone pills, the conduct underlying the present offense. Hanuka Tr. 17:17–19 ("Q: Well, you were selling these drugs, weren't you? A: Yes.").

The quantity of pills Hanuka needed to both take and to sell were acquired by visiting multiple physicians during the same time period and receiving prescriptions from each. Hanuka PSR ¶ 46; *see also* Hanuka PSR ¶¶ 7–10. These doctors were unaware, and they were not told by Hanuka, that they were not the only physician prescribing oxycodone at the time. Hanuka Tr. 20:14–17. The only indication that any physician had that their patient may have been abusing the drug came in June 2010, on his last visit to a physician who required a urinalysis test before issuing prescriptions. *Id.* at 24:17–23. During that visit, Hanuka appeared to be "high" and refused to submit to the test, claiming that the physician knew that it would come back positive for oxycodone use. Hanuka PSR ¶ 9. He was escorted out of the office by several patients who were in the lobby and overheard him make "a scene" trying to convince the physician to give him a prescription. *Id.*

On June 3, 2010, Hanuka self-surrendered in New York at the offices of the U.S. Drug Enforcement Agency (DEA), which had been conducting an investigation of his activities. *Id.* ¶ 12. He was charged with possessing with the intent to distribute oxycodone. *Id.* He pleaded guilty.

### iv.        Post-Arrest Rehabilitation

In 2008, Hanuka had begun a serious relationship with a young woman, S. *Id.* ¶ 38. Their romance blossomed; they were engaged to be married. *Id.* Hanuka describes Ms. S. as having been the "best thing that ever happened" to him. *Id.* His mother describes their relationship as being "beautiful." *Id.* ¶ 40. After Hanuka's April 2010 arrest and release, Ms. S. convinced him to move to West Palm Beach, Florida. *Id.* ¶ 38. She believed that relocation would give them an opportunity to have a "normal life." *Id.* The move appears to have had the intended effect on Hanuka.

Starting at approximately the time they decided to move, Hanuka was attempting to overcome his addiction on his own. Hanuka Tr. 10:22. As subsequent events such as his June 2010 encounter with the physician show, he was unsuccessful. To get the help he needed, on November 9, 2010, he entered into a substance abuse treatment program at the Palm Beach Treatment Center. Hanuka PSR ¶ 47. Today, he remains on a methadone maintenance program administered by the Center, which will be shortly completed. *Id.* He claims that he last took oxycodone at the time of his guilty plea in September 2010. *Id.*

On October 22, 2010, approximately a month before voluntarily entering the substance abuse treatment program, Hanuka found full-time employment as a salesman at a West Palm Beach car dealership. *Id.* ¶ 52. His tenure there, which continues, has been successful. In January 2011, he was the dealership's top grossing salesman. *Id.* In the future, he hopes to

become involved in the dealership's finance department. *Id.* The owner submitted a letter to the court touting Hanuka's dedication to his job, his punctuality, and other positive qualities; it offers the dealership's "unwavering support." Ct. Ex. 2.

Hanuka continues on his path to rehabilitation even though his fiancé, who was instrumental in starting him in that direction, died in a car accident in November of 2010. Hanuka PSR ¶ 38. When Ms. S. was several hours late coming home, Hanuka headed in the direction of her last known location. *Id.* He arrived to find that she had been killed. *Id.*

Hanuka continues to work sixty-hour weeks at the car dealership and to attend the substance abuse treatment program. Hanuka Tr. 11:5–6; *id.* at 11:25–12:2. In January 2012, he will begin attending Palm Beach State College, where he will take night classes working toward an Associate Degree in business. *See* Letter from Nitvhia Hanuka, defendant's mother, to the Court (June 7, 2011).

Hanuka was sentenced to non-incarcerative supervision and continuing drug treatment. *See infra* Part VI.B.

### B.     Andrew Ilayayev—Genesis in Illegal Social Use

#### i.     Personal History

Andrew Ilayayev was born on September 28, 1982 in Uzbekistan. Presentence Investigation Report of Andrew Ilayayev ("Ilayayev PSR") ¶ 33. His mother and father were divorced the same year. *Id.* Along with his mother, two siblings, and maternal grandparents, he immigrated to the United States in 1992. *Id.* ¶ 35. His biological father does not maintain contact with, or provide financial support to, the family. *Id.* ¶¶ 33, 35. Welfare, food stamps, and housing assistance have helped the family since it arrived in the United States. *Id.* ¶ 35.

Mother and children resided together with grandparents in Queens until 2000, when the family moved to its own apartment in Brooklyn. *See* Defendant's Letter to the Court 2 (Sept. 11, 2006) ("Ilayayev Letter"). Ilayayev's younger sibling, Olga, continued to live with her grandparents during the week because the grandparents' apartment was closer to her school. *Id.* ¶ 34. His older sibling, Oleg, is currently incarcerated in Ohio on a ten-year sentence for drug trafficking. *Id.*

Ilayayev attended a private sectarian high school for two years. *Id.* ¶ 43. He then transferred to James Madison High School, a large public school in Brooklyn. *Id.* After graduating, he enrolled in, and attended, Kingsboro Community College for one year. *Id.*

From 2000 until the time of his original arrest in 2005, Ilayayev held several full- and part-time jobs. *See id.* ¶¶ 45–51. They included: promoter for a club, *id.* ¶ 50; bicycle messenger, *id.* ¶ 49; caterer, *id.* ¶ 48; food preparer in a delicatessen, *id.* ¶ 47; driver's assistant for Federal Express, *id.* ¶ 46; and sales associate at Macy's, *id.* ¶ 44. He was last employed as a barber in Brooklyn. Violation of Supervised Release Report of Andrew Ilayayev at 5 ("Violation Report").

### ii.      History of Drug Use

Ilayayev began using marijuana at age sixteen, after enrolling in James Madison High School. Ilayayev PSR ¶ 42; Ilayayev Letter at 6. He used that drug daily until, at age seventeen, he turned to more powerful illegal drugs. Ilayayev PSR ¶ 42. He used LSD from age seventeen until twenty, *id.*, ketamine, a hallucinogenic drug commonly known as "Special K," daily from age nineteen until twenty-one, *id.*, and from nineteen until his original arrest, he used MDMA extensively, *id.* He also tried cocaine on several occasions. *Id.* When twenty-one, he began to

use phencyclidine, PCP. *Id.* He would occasionally use Xanax, a prescription anti-anxiety medication, to help him sleep. *Id.*

### iii. Original Offense and Sentence

Ilayayev was first arrested on August 31, 2005 by a DEA Task Force that had been conducting an undercover investigation of his activities since July 2003. *Id.* ¶¶ 2–5. The Force had used a confidential witness to purchase MDMA pills, or ecstasy, from Ilayayev. *Id.* ¶ 2. In total, Ilayayev sold or attempted to sell over 5,000 MDMA pills to the confidential witness, including 3,000 on the day of his arrest. *Id.* ¶¶ 3, 5.

On November 16, 2005, Ilayayev pleaded guilty to one count of a nine-count indictment, *id.* ¶ 1, alleging that between August 2003 and August 31, 2005, Ilayayev, together with others, conspired to distribute and possess with intent to distribute MDMA, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).

He was sentenced to the few days of time served, and the sentence was stayed to permit the Probation Department to make arrangements for him to be transferred from jail to an in-patient drug treatment facility. Violation Report at 3. In addition, five years supervised release was imposed, with the special condition that he participates in a drug and alcohol treatment program as directed by the Probation Department. *Id.*

### iv. Charged Violations of Supervised Release

The Probation Department first provided Ilayayev with the opportunity to participate in the district's STAR Court, supervised intensively by the late United States District Court Judge Charles P. Sifton. *Id.*; *see also* Charles P. Sifton & Jack B. Weinstein, *Report on a Proposed Intensive Post-Sentence Drug Supervision Program for the Eastern District of New York* (2006) (STAR Program). Because of his unabated drug addiction and other non-compliant behavior, he

was discharged from this program.  Violation Report at 4.  On November 19, 2008, his conditions of supervised release were modified by Judge Sifton to include ninety days home confinement, which, after several incidents of non-compliance, he successfully completed.  *Id.* at 4.

Ilayayev was subsequently charged with multiple violations of the terms of his supervised release.  Chronologically, the first charged violation occurred on April 1, 2010, when Ilayayev was arrested by the New York Police Department ("NYPD") and charged with Intent to Obtain Transportation without Paying, in violation of N.Y. Penal Law 165.15.  *Id.* at 7.  He attempted to gain entry into a subway station without paying the fare.  *Id.*

A second charged violation occurred on July 7, 2010, when Ilayayev was arrested by the NYPD and charged with Criminal Possession of Narcotic Drug 4th Degree, in violation of N.Y. Penal Law 220.09; Criminal Possession Controlled Substance 7th Degree, in violation of N.Y. Penal Law 220.3; and Criminal Trespass 2nd Degree, in violation of N.Y. Penal Law 140.15.  *Id.* at 6.  According to the arrest report, Ilayayev was observed with others in possession of hypodermic needles and a suspected narcotic.  *Id.*  Ilayayev claims that he had just happened upon friends of his and was speaking with them when the NYPC pulled up in a car, got out, and frisked him and his friends for no reason.  *Id.*  He says that as the time of his arrest he was standing on the sidewalk inside a small fenced area.  *Id.*  The officers arrested him for trespass and he was arraigned in Kings County Criminal Court.  *Id.*  This charge was consolidated with the April 1 charge.  *Id.*  On July 15, 2010, he pleaded guilty to disorderly conduct in satisfaction of both charges.  *Id.*  He was sentenced to a conditional discharge and ordered to perform two days community service, which he completed.  *Id.*

The third charged violation occurred on September 15, 2010, when Ilayayev was arrested by the NYPD and charged with Criminal Sale of a Controlled Substance 7th Degree, in violation of N.Y. Penal Law 220.3. *Id.* at 4. He possessed PCP. *Id.* The circumstances surrounding that arrest, according to Ilayayev, are as follows: On the day of his arrest, he claims to have been coming off the bus on his way home from work at the barber shop where he is employed. *Id.* As he turned the corner, he claims then to have walked directly into the middle of a police "drug sweep." *Id.* One of the arresting NYPD officers from the 61st Precinct recognized him from his former graffiti days when he was known as "DOTS" (his graffiti tag name). *Id.* He claims that the NYPD officer threw him up against the wall and began to frisk him. *Id.* At this point, he claims he told the officer that he had no drugs on his person and that, because he was on federal supervision, he wanted no problems. *Id.* During the frisk, the arresting officer found a suspected drug on Ilayayev's person. The officer identified the substance as PCP, but later toxicology reports indicated that it was Special K. *Id.* at 5. According to the Probation Department, this charge was dismissed because of the officer's misidentification of the drug. Tr. of Violation Sent'g of Andrew Ilayayev 5:7–10 (June 30, 2011) ("Ilayayev Tr.").

The fourth and final charged violation occurred as a result of Ilayayev's failure to inform the Probation Department of his September 15 arrest within seventy-two hours of its occurrence, as required by the conditions of his supervised release. *Id.* Although the arrest occurred on September 15, 2010, Ilayayev did not inform the Probation Department of it until he was instructed to report on October 10, 2010. *Id.*

### v.     Plea and Continuing Drug Use

On March 28, 2011, Ilayayev pleaded guilty before this court on Charges Two and Four of the four-charge violation detailed above. [dkt. no. 48]. He was ordered to enter outpatient

drug treatment from that time until the date of his sentence. Ilayayev Tr. 2:14–16. He has, for the most part, attended scheduled treatment sessions. *Id.* at 3:14–16. The Probation Department reports that he has had continuing difficulty refraining from drug use. Specifically, the Probation Department reports that Ilayayev complained of chest pains and stomach pains, and was sweating profusely, during his May 4, 2011 treatment session. *Id.* at 3:16–20. The registered nurse present at the time found that he had an elevated blood pressure and shallow breathing. *Id.* at 3:21–23. He told the nurse that he had taken Special K earlier that day, which he later admitted in court. *Id.* at 3:23–25; *id.* at 6:22–7:4. The nurse called 911, and he was transported by ambulance to Coney Island Hospital, where he was kept overnight for observation. *Id.* at 3:25–4:2.

From the evidence at the sentencing hearing the court found that Ilayayev was unable to control or cure his drug addiction on an outpatient basis. *See* Part VII.C, *infra*, for the sentence imposed.

## III.    Oxycodone and OxyContin—Properties and Effects

Oxycodone belongs to a class of drugs called opiate analgesics. *Oxycodone: MedlinePlus Drug Information*, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/ meds /a682132.html (last visited Aug. 4, 2011). Like morphine, with which it shares a similar chemical composition, U.S. Gov't Accountability Office, GAO-04-110, *Prescription Drugs: OxyContin Abuse and Diversion and Efforts to Address the Problem* 8 (2003) [hereinafter GAO, *Prescription Drugs*], oxycodone is used in its pure form predominately to treat "acute or . . . breakthrough pain," Eija Kalso, *Oxycodone*, 29 J. Pain & Symptom Management 47, 47 (2005). Although their chemical compositions are similar, some studies have shown that oxycodone is twice as powerful as morphine in effect. *See* GAO, *Prescription Drugs*, *supra*, at

29 (citing G.B. Curtis et al., *Relative Potency of Controlled-Release Oxycodone and Morphine in a Postoperative Pain Model*, 55 Eur. J. Clinical Pharmacology 425 (1999)); Kalso, *supra*, at 48 (citing Eija Kalso, *Antinociceptive Effects and Central Nervous System Depression Caused by Oxycodone and Morphine in Rats*, 70 Pharmacological Toxicology 125 (1992)).

This drug operates as a painkiller by attaching to "specific proteins . . . found in the brain, spinal cord, and gastrointestinal tract" and "block[ing] the perception of pain." Nat'l Inst. on Drug Abuse, U.S. Dep't of Health & Human Servs., *Research Report Series, Prescription Drugs: Abuse & Addiction* 2 (2001). In addition to its painkilling effects, it can also "induce euphoria by affecting the brain regions that mediate what we perceive as pleasure." *Id.* Oxycodone can be taken in multiple ways besides orally in pill form, such as intravenously (through an I.V.), intramuscularly (through a hypodermic needle), and intranasally (through the nose). *See* Kalso, *supra*, at 47.

Today, oxycodone is often combined with other, non-opioid painkillers such as acetaminophen, aspirin, and ibuprofen. MedlinePlus, *supra* (listing examples). Designed to release its oxycodone slowly, over an extended period of time, a single dose of OxyContin can provide pain relief for up to twenty-four hours. Leonard J. Paulozzi, *Opioid Analgesic Involvement in Drug Abuse Deaths in American Metropolitan Areas*, 96 Am. J. Pub. Health 1755, 1755 (2006). Significantly, in order to facilitate its long-acting effects, OxyContin contains a substantially higher concentration of oxycodone than other oxycodone-containing pain medications. GAO, *Prescription Drugs*, *supra*, at 8–9; *id.* at 9 n.14 ("For a 12-hour dosing period, one OxyContin tablet replaces two Percodan or Tylox tablets, and one OxyContin tablet contains twice as much oxycodone as one of the other tablets."); *see also McCauley v. Purdue Pharma, L.P.*, 331 F. Supp. 2d 449, 452 (W.D. Va. 2004) ("OxyContin's primary distinctiveness

from other oxycodone-based analgesics is that its oxycodone is delivered via a controlled-release formulation [and] [a] corollary to this feature is that each tablet of OxyContin contains more milligrams of active oxycodone than does a single table of other opiate pain medications."). That higher concentration causes OxyContin to be the most likely of these drugs to be abused. GAO, *Prescription Drugs*, *supra*, at 8–9; *see also* David L. Robinson, Note, *Bridging the Gaps: Improved Legislation to Prohibit the Abuse of Prescription Drugs in Virginia*, 9 App. J.L. 281, 284 (2010) ("The purity of the highly-concentrated narcotic oxycodone makes the OxyContin pill a prime target for abuse and diversion.").

Both oxycodone and OxyContin are classified under the CSA as Schedule II controlled substances, 21 C.F.R. § 1308.12(b)(1) (2010), because both have high potential for abuse and may lead to severe psychological or physical dependence, GAO, *Prescription Drugs*, *supra*, at 2; *see also* Rollin Gallagher, *Opioids in Chronic Pain Management: Navigating the Clinical and Regulatory Challenges*, 53 J. Fam. Prac. 23 (2004) (distinguishing between physical dependence and addiction, where addiction is characterized by "compulsive use of a drug, impaired control over drug use, craving, and continued use of a drug despite harm to self or others," and physical dependence is characterized by "abstinence syndrome following discontinuation of therapy, substantial dose reduction, or administration of an opioid antagonist such as naloxone"). The DEA has described the physiological effects of oxycodone and OxyContin as being "similar to those of heroin." GAO, *Prescription Drugs*, *supra*, at 2. Extended and continuous exposure to high levels of oxycodone can produce a tolerance to the drug's pain relieving effects. *See* Nat'l Drug Intelligence Ctr., U.S. Dep't of Justice, *National Prescription Drug Threat Assessment 2009*, 2 (2009) [hereinafter NDIC 2009 Report] ("Moreover, unintentional misuse or intentional abuse of [oxycodone] often produces feelings of euphoria, which can lead to increased levels of

intentional abuse and subsequent tolerance, physical dependence, or addiction." (footnotes omitted)).  At the same time, users who are unable to take the amount necessary to overcome their tolerance, or who abruptly stop taking it altogether, go into withdrawal, or colloquially, they get "dope sick," Khary K. Rigg et al., *Prescription Drug Abuse & Diversion: Role of the Pain Clinic*, 40 J. DRUG ISSUES 681 (2010) (interviewing a methadone maintenance program client).  Withdrawal symptoms can be severe, and include nausea, vomiting, diarrhea, loss of appetite, anxiety and depression, and elevated heart rates and breathing.  MedlinePlus, *supra* (listing the many side effects of oxycodone withdrawal).  Given the potential for developing a tolerance to the drug's pain-relieving effects and the severity of withdrawal symptoms, oxycodone and OxyContin abuse has the potential to lead to overdose and death, as users ingest greater and greater quantities of the drugs at one time.  GAO, *Prescription Drugs*, *supra*, at 2.

## IV.      Prevalence of Oxycodone and OxyContin Abuse

### A.      Background Contributors to Abuse

Humans have used opiates for various reasons, including treating pain, for millennia.  *See* Kenneth L. Kirsh et al., *History of Opioids and Opiophobia*, *in* Pain and Chemical Dependency 3 (Howard S. Smith & Steven D. Passik eds., 2008) ("It has been evidenced that opium was in use in Mesopotamia as early as 5,000 years go.").  Oxycodone, a synthetic drug derived from opium, was first used for medical purposes in Germany in 1917.  Kalso, *supra*, at 47.  Introduced to the market in 1996, OxyContin is a more recent invention.  GAO, *Prescription Drugs*, *supra*, at 9.  It was approved by the U.S. Food and Drug Administration in 1995 for the treatment of chronic moderate-to-severe pain lasting more than a few days.  *Id.* at 8.

In response to the World Health Organization's 1986 declaration that "inadequate treatment of cancer and noncancer pain is a serious public health concern," *id.* at 1, physicians

began changing their practice in treating chronic and severe pain.  Beginning in the early 1990s, they were "much more proactive and aggressive [in their] use of opioid analgesics in treating pain in the general population."  Benedikt Fischer et al., *Characterizing the "Awakening Elephant" of Prescription Opioid Misuse in North America: Epidemiology, Harms, Interventions*, 35 Contemp. Drug Probs. 397, 404 (2008) (citation omitted).  Aggressive treatment practices led to an increase in legitimate distribution of opioid medications.  *See id.* at 402–04.  From 2003 through 2007, the amount of prescription opioids distributed to retail registrants with the DEA increased fifty-two percent.  NDIC 2010 Report, *supra*, at 42 (citation omitted); *see also infra* Part VI.A (explaining DEA regulations governing physicians and pharmacists authorized to prescribe and fill prescriptions for Schedule II drugs).  Between 1997 and 2002, the medical use of oxycodone and oxycodone-containing medications such as OxyContin increased over 380%.  Fischer et al., *supra*, at 404.  Oxycodone prescriptions increased significantly between the years 2003 and 2007.  In 2003, U.S. physicians wrote approximately 1,083,000 prescriptions for oxycodone.  NDIC 2009 Report, *supra*, at 5 tbl.1.  By 2008, that number had increased approximately 780% to 8,472,000.  *Id.*  In 2002, several years after its introduction, OxyContin sales exceeded $1 billion from approximately 7 million prescriptions.  GAO, *Prescription Drugs*, *supra*, at 9.  These drastic increases in legitimate opioid prescriptions coincide with equally sharp increases in the abuse of oxycodone and OxyContin, suggesting that to some the two are related.  *See* Fischer et al., *supra*, at 405–06.

Bucking the trend of increasing opioid prescriptions, the number of OxyContin prescriptions issued by physicians has decreased from 7 million in 2002 to roughly 2 million in 2007.  NDIC 2009 Report, *supra*, at 5 tbl.1.  Despite this decrease, OxyContin still occupies a significant, and increasing, role in prescription drug abuse in the United States.  *But see* Abby

Goodnough & Katie Zezima, *Drug Is Harder to Abuse, but Users Persevere*, N.Y. Times, June 16, 2011, at A21 [hereinafter Goodnough & Zezima, *Harder to Abuse*] (suggesting that a recent reformulation of OxyContin has forced abusers to turn to other drugs).  One study found that "[c]ontrolled-release oxycodone [, as exemplified by OxyContin,] has quickly surpassed other oxycodone formulations in terms of [emergency department mentions] and its use has increased at a greater rate than morphine or the rate of all opioids combined."  Asokumar Buvanendran et al., *Increasing Patterns of Oxycodone Misuse: Findings from a National Database*, 101 Anesthesiology 1136 (2004); *see also* Cicero et al., *supra* ("In this study, we report systematic data to indicate that opioid analgesic abuse has in fact increased among street and recreational drug users, with OxyContin and hydrocodone products the most frequently used.").

Much of OxyContin's popularity among drug abusers can be attributed to its unique formulation.  As mentioned above, it contains a significantly higher percentage of oxycodone than do other comparable medications.  In an ironic twist, users may have inadvertently been alerted on how to release oxycodone from OxyContin's controlled-release encapsulation by the drug's own label, which warns users not to crush the pills because doing so could release toxic amounts of oxycodone.  Sandra D. Comer & Judy B. Ashworth, *The Growth of Prescription Opioid Abuse*, *in* Pain and Chemical Dependency 21 (Howard K. Smith & Steven D. Passik eds., 2008).  The powder from a crushed OxyContin pill can be snorted or combined with water and injected into the body, where the drug is rapidly absorbed in the user's bloodstream, producing a euphoric effect.  Leonard J. Paulozzi, *Opioid Analgesic Involvement in Drug Abuse Deaths in American Metropolitan Areas*, 96 Am. J. Pub. Health 1755, 1756 (2006) ("Abusers have learned to ingest and inject pulverized OxyContin pills, defeating the controlled-release mechanism and releasing dangerous amounts of the drug within a short time.").  The FDA's 2001 revisions to the

OxyContin label retained the language warning against crushing the pills, but "included a [new] black box warning, the strongest warning an FDA-approved drug can carry, and specifically addressed areas of concern related to the opioid characteristics of oxycodone and its risk of abuse and diversion." GAO, *Prescription Drugs*, *supra*, at app. II.

### B.     Oxycodone and OxyContin Abuse: Who, Where, and Impact

Reports of rampant OxyContin abuse began to surface in the media as early as 2000. *Id.* at 9. "These [warnings] first appeared in rural areas of some states, generally in the Appalachian region, and continued to spread to other rural areas and larger cities in several states. Rural communities in Maine, Kentucky, Ohio, Pennsylvania, Virginia, and West Virginia were reportedly being devastated by the abuse and diversion of OxyContin." *Id.* Similar accounts continue to appear, implicating both OxyContin and oxycodone as culprits in community devastation. *See* Sabrina Tavernise, *Ohio County Losing Its Young to Painkillers' Grip*, N.Y. TIMES, Apr. 19, 2011, at A1. Records of individuals arrested for illegal distribution of oxycodone and OxyContin indicate that the problem of prescription opioid abuse and addiction has not subsided. *See, e.g.*, Edmund H. Mahony, *Man Gets 5 Years for Illegal Oxycodone Sales*, Hartford Courant, July 19, 2011, at B5.

The pattern of abuse and addiction continues its spread to major urban centers throughout the country. One study addressing the issue of urban abuse of prescription opioids analyzed data from the Drug Abuse Warning Network ("DAWN"). DAWN is a database containing information relating to deaths in twenty-eight metropolitan areas in which drug abuse either caused or contributed to the death. Comer & Ashworth, *supra*, at 19. According to this study, reports of deaths involving oxycodone increased 727.8% from 72 reports to 596 reports from 197 to 2002. Paulozzi, *supra*, at 1755. It also found that the increase in reports of deaths related to

prescription opioids, including oxycodone and OxyContin, was so drastic that, by 2001, they "displaced both heroin or morphine and cocaine as the most common type of [death from a] drug reported." *Id.* Anecdotes in the media confirm that opioid abuse is a continuing problem in urban areas. *See, e.g.*, *Sale of Oxycodone Lands Man Behind Bars*, BuffaloNews.com, http://www.buffalonews.com/city/police-courts/police-blotter/article494589.ece (last visited Aug. 4, 2011); *Doctors Abandoning Their Oaths*, BuffaloNews.com, http://www.buffalonews.com/city/special-reports/rx-for-danger/article368425.ece (last visited Aug. 4, 2011); Elissa Gootman, *Staten Island Ice Cream Truck Sold Oxycodone Too, Officials Say*, N.Y. Times, http://cityroom.blogs.nytimes.com/2011/03/17/staten-island-ice-cream-truck-sold-oxycodone-too-officials-say/ (last visited Aug. 4, 2011); Michael Wilson, *Staten Island Doctor Charged in a Prescriptions Scheme*, N.Y. Times, Nov. 16, 2010, at A31.

One of the most disturbing aspects of the problem is its impact on children and teenagers. *See* Tavernise, *supra*. An article describing an exhaustive survey of the available research on prescription opioid abuse discusses the impact of illicit drug use on youths:

> In the Monitoring the Future (MTF) survey, the annual prevalence of narcotics use (other than heroin) more than doubled among 12[th] grades between 1992 and 2000. The annual prevalence of OxyContin (Oxycodone) abuse was 5% among students surveyed, reflecting a significant prevalence increase between 2002 and 2004 alone. A longitudinal survey of illicit and non-medical prescription drug use in a nationally representative sample of college students in the U.S. saw the prevalence of [prescription opioid] misuses (in the last 12 months) more than double between 1993 (3.1%) and 2001 (7.3%), with prevalence and increase levels for [prescription opioids] higher than any other prescription or illicit drug (except for marijuana) in 2003. These and similar other data [demonstrate] that "illicit pain reliever use . . . disproportionately effects [sic] the young."

Fischer et al., *supra*, at 400.

Some have suggested that such high levels of opioid abuse in youths is due to the perception among that age group that prescription opioids are relatively safe when compared to

illic street drugs such as cocaine.  Richard A. Friedman, *The Changing Face of Teenage Drug Abuse: The Trend Toward Prescription Drugs*, 14 New Eng. J. Med. 1448 (2006) ("[Teenagers] often characterized their use of prescription drugs as 'responsible,' 'controlled,' or 'safe.'  The growing popularity of prescription drugs also reflects the perception that these drugs are safer than street drugs.").  Another study speaks to which youths, specifically, are abusing prescription opioids; it "refute[s] popular suggestions that young [prescription opioid] users tend to be white-collar [and] middle-class," showing instead that they are "mainly lower-income youth at high-risk for other illicit and/or poly-drug use."  Fischer et al., *supra*, at 401 (citing Hung-En Sung et al., *Nonmedical Use of Prescription Opioids Among Teenagers in the United States: Trends and Correlates*, 37 J. Adolescent Health 44 (2005)).

No matter who is affected and where concerns are most effects are most felt, there is little doubt that the problem of prescription opioid abuse is real and growing worse.  *See* Kenneth L. Kirsh et al., *supra*, at 6 ("[I]t has become abundantly clear, regardless of what index one uses to gauge the problem, that the problem is on the rise." (citations omitted)).  As revealed by the *National Survey on Drug Use and Health*, new initiates in the nonmedical use of prescription opioids have "quadrupled, from an incidence of 573,000 in 1990 to an astounding 2.5 million in 2002."  Comer & Ashworth, *supra*, at 19 (citation omitted).   In 2004, the number of new users of opioid prescriptions exceeded even the number of new users of illicit drugs such as marijuana. *Id.*  According to the National Drug Intelligence Center ("NDIC"), a department of the U.S. Department of Justice, in its report entitled *National Drug Threat Assessment 2010*, prescription pain relievers were used non-medically for the first time in 2008 by approximately 2.2 million people.  NDIC 2010 Report, *supra*, at 3.  The 2003 DAWN report showed that prescription opioid-related emergency room visits represented roughly seventeen percent of abuse-related

admissions that year.  Comer & Ashworth, *supra*, at 19.  That report also indicated that the

number of emergency department visits related to prescription opioid abuse increased from

42,857 visits in 1995 to 108,320 in 2002, or roughly 252%.  *Id.*  Law enforcement agencies are

increasingly "reporting that pharmaceutical diversion and abuse pose the greatest drug threat to

their areas, in part because of increases in associated crime and gang involvement."  NDIC 2010

Report, *supra*, at 42.

There are some significant but under-recognized nuances to the problem of prescription

opioid abuse and addiction.  For one, multiple studies have shown that where therapy is

administered correctly, addiction is unlikely to occur.  *See* Ronald T. Libby, CATO Inst.,

*Treating Doctors as Drug Dealers: The DEA's War on Prescription Painkillers* 8 (2005) (citing

studies) ("In truth, however, the medical evidence overwhelmingly indicates that when

administered properly, opioid therapy rarely, if ever, results in 'accidental addiction' or opioid

abuse.").  Studies have shown that opioid addiction is generally associated with patients

possessing a prior history of substance abuse, and that addiction does not occur accidentally in

people with no such history and who follow their physicians' advice.  *See, e.g.*, Deni Carise et

al., *Prescription OxyContin Abuse Among Patients Entering Addiction Treatment*, 164 Am. J.

Psychiatry 1750, 1755 (2007) ("Clearly, the pharmaceutical opioid problems of the individuals in

this sample were part of a larger pattern of alcohol and other drug use—the problems were not

'accidental,' secondary to prescribed use for pain or other medical problems.").

Where deaths related to overdose on prescription opioids were examined, researchers

have come to similar conclusions.  *See* Libby, *supra*, at 6 (citing Cone et al., *Oxycodone*

*Involvement in Drug Abuse Deaths: A DAWN-Based Classification Scheme Applied to an*

*Oxycodone Postmortem Database Containing over 1000 Cases*, 27 J. Analytical Toxicology 57

(2003)) (discussing a study that examined 919 deaths related to oxycodone in twenty-three states over a three-year period that showed only twelve deaths resulting from oxycodone use alone, with the remainder resulting from "multiple drug poisoning").  The NDIC concluded in its 2010 report that "[p]rescription opioid overdose deaths are increasing, primarily because the decedents took the drugs nonmedically, other than as prescribed, or in combination with other drugs and/or alcohol."  NDIC 2010 Report, *supra*, at 42.  To support that conclusion, the report cites to and discusses a study conducted by the Center for Disease Control ("CDC"):

> CDC reports that a high percentage of people who die from a prescription opioid poisoning have a history of substance abuse and that many have more than one [prescription opioid] in their system at the time of death.   For example, a 2008 CDC study found that 82.3 percent of diversion-related unintentional overdose decedents in West Virginia in 2006 had a history of substance abuse and that 79.3 percent had used multiple substances that contributed to their deaths.  In many instances, these individuals were simply using prescription opioids (either singularly or in combination with other CPDs, alcohol, or illicit drugs) to achieve a heroin-like euphoria, and many did not have a legitimate prescription for the drugs.

*Id.*  If nothing else, the results of this research suggest that addiction to oxycodone or OxyContin does not necessarily follow from their use in a treatment regimen properly overseen by a physician.

### C.      Sources of Illicit Oxycodone and OxyContin

The NDIC reports that prescription opioid diversion, in which the drugs are diverted from their intended medical use and into recreational use, occurs at multiple points along the supply chain:

> [Prescription drug] diversion typically involves individuals who doctor-shop and forge prescriptions, unscrupulous physicians who sell prescriptions to drug dealers or abusers, unscrupulous pharmacists who falsify records and subsequently sell the drugs, employees who steal from inventory, executives who falsify orders to cover illicit sales, individuals who commit burglaries or robberies of pharmacies, and individuals who purchase [prescription drugs] from rogue Internet pharmacies. [Prescription drug] diversion also involves the sharing or

purchasing of drugs between family and friend or individual theft from family and friends.

NDIC 2009 Report, *supra*, at 1 (footnote omitted).

"Though much attention has been focused on the dishonest patient 'doctor shopping' and the rogue physician opening a 'pill mill,' data gathered from the DEA and analyzed by Joranson (2005) confirmed that much of the diversion of prescription opioids takes place at the level of the pharmacy in the form of burglaries, robberies, and employee and customer theft."  Comer & Ashworth, *supra*, at 22 (citing David E. Joranson & Aaron M. Gilson, *Drug Crime is a Source of Abused Pain Medications in the United States*, 30 J. Pain Symptom Mgmt. 299 (2005)).  More than 1,800 pharmacy robberies occurred nationally over the last three years.  *See* Abby Goodnough, *Pharmacies Under Siege from Robbers Seeking Drugs*, N.Y. Times, Feb. 7, 2011, at A14.  "[T]ypically [the robberies are] conducted by young men seeking opioid painkillers and other drugs to sell or feed their own addictions.  The most common targets are oxycodone (the main ingredient in OxyContin), hydrocodone (the main ingredient in Vicodin) and Xanax."  Goodnough, *supra*; *see also* Chris Hawley, *"An Epidemic": Pharmacy Robberies Sweeping US*, MSNBC.com, http://www.msnbc.msn.com/id/43536286/ns/us_ news-crime_and_courts/t/ epidemic-pharmacy-robberies-sweeping-us/# (last visited Aug. 4, 2011) ("Thieves are overwhelmingly taking oxycodone painkillers like OxyContin or Roxicodone . . . .").  From 2006 to 2010, the number of pills stolen increased from 706,000 to 1.3 million.  Hawley, *supra*.  This apparent "epidemic" of pharmacy robberies has pharmacists around the country understandably concerned for their safety and for the safety of their customers.  *See* Goodnough, *supra*; *see also* Paul Larocco, *Druggists Fret Over Security*, Newsday, June 28, 2011, at A3.  Pharmacists' worries are well founded in light of the often violent nature of the robberies, which can sometimes even turn deadly.  *See* Tim Perone, *Coheed and Cambria Bassist in "Drug Rob"*

*Bust*, N.Y. Post, http://www.nypost.com/p/news/local/coheed_and_cambria_bassist_in_drug_
P7qOVcYB45DwsxZIo343LL (last visited Aug. 4, 2011); Hawley, *supra*; Al Baker & Joseph
Goldstein, *Focus on Prescription Records Leads to Arrest in 4 Killings*, N.Y. Times, June 23,
2011, at A18.

In contrast, unscrupulous physicians' "involvement in criminal diversion is suggested to
be rare and less than 0.1% of doctors registered with the DEA were investigated in 2001—with
only few having punitive action taken against them." Fischer et al., *supra*, at 416 (citing James
Zacny et al., *College on Problems of Drug Dependence Taskforce on Prescription Opioid Non-
Medical Use and Abuse: Position Statement*, 69 Drug & Alcohol Dependence 215, 226 (2003)).

Notwithstanding the minimal role they may play in criminal diversion of prescription
opioids, physicians play a large role in overseeing the proper administration of those drugs in
patients who require them for legitimate medical purposes. Failure of proper oversight has the
potential to lead to serious abuse and diversion of the drugs.

**V.      The Medical Community's Obligations in Relation to Oxycodone and OxyContin
         Prescribing**

   **A.      Pressures Placed on Physicians in Prescribing**

In choosing to prescribe or not to prescribe opioid painkillers such as oxycodone and
OxyContin, physicians are subject to competing pressures. On one side is the force of regulation
by both the federal and state governments. "All businesses that manufacture or distribute
[oxycodone, OxyContin, or other opioid painkillers], all health professionals entitled to dispense
or prescribe them, and all pharmacies entitled to fill prescriptions must comply with the CSA,
Code of Federal Regulations (CFR), and state regulations." NDIC 2009 Report, *supra*, at 1; *see
also* Part VI, *infra*. For physicians and pharmacists, as well as for manufacturers and

distributors, compliance includes "registering with the DEA and complying with a series of requirements related to drug security and records accountability."  NDIC 2009 Report, *supra*, at 1.  A physician's opioid prescription practice, if perceived as improper by the DEA or an equivalent state agency because it appears excessive, can result in thorough and often covert investigation by those agencies, *see* Libby, *supra* (detailing the DEA's investigatory tactics), and possibly the filing of illegal distribution charges against the physician, *see, e.g.*, Wilson, *supra*.  If convicted on those charges, physicians "are subject to the same mandatory drug sentencing guidelines designed to punish conventional drug dealers."  Libby, *supra*, at 3; *see also United States v. Moore*, 423 U.S. 122 (1975).  Furthermore, state licensing boards may revoke a physician's medical license if they find overprescribed opioid painkillers.  *See* Christine Gorman et al., *The Case for Morphine*, Time, Apr. 28, 1997, http://www.time.com/time/magazine/article/ 0,9171,986254-3,00.html (identifying Tennessee, West Virginia, and New York as states whose review boards are "notorious" for revoking the licenses of physicians who prescribe large quantities of opioids).  And, most serious, if a patient dies from an overdose of one of these drugs, the prescribing physician could face charges of manslaughter or even murder.  *See, e.g.*, Barry Meier, *OxyContin Prescribers Face Charges in Fatal Overdoses*, N.Y. Times, Jan. 19, 2002, at A14.

Such severe consequences for a physician's career, or in the worst of circumstances, personal freedom, provide a significant incentive for physicians *not* to prescribe opioid painkillers, regardless of whether a particular patient would truly benefit from them.  Fearing investigation by the authorities, many physicians are reluctant to prescribe opioid pain medications.  *See* Libby, *supra*, at 3 (citing and discussing studies) ("[A] 2001 study of California doctors found that 40 percent of primary care physicians said fear of investigation

affected how they treated chronic pain."); Fisher et al., *supra*, at 415 ("Several studies documented that [government regulation] led physicians to reduce drug does, to prescribe a drug in a less regulated schedule or to avoid prescribing opioids for patients with chronic pain 'due to concerns of overzealous regulatory scrutiny.'" (citation omitted)); Richard Payne, *Pain Management and the Medical Profession: What is Our Responsibility?, in* Pain and Chemical Dependency 28 (Howard S. Smith & Steven D. Passik eds., 2008) (citing a study finding that more than fifty percent of New York State physicians restricted their prescribing behaviors because they feared sanctions by state regulators).

Reluctance to prescribe these medications contributes to what is widely viewed in the medical community as a pervasive under treatment of pain in the United States. *See* Libby, *supra*, at 2 ("Untreated pain is a serious problem in the United States. . . . [M]ost experts agree that tens of millions of Americans suffer from undertreated or untreated pain."); Melinda Beck, *Diagnosing a Patient as a Faker*, Wall St. J., July 5, 2011, at D1 ("[T]he Institute of Medicine, which advises the government on health issues, reported last week that pain is all too often undertreated in the U.S. For many of the 116 million Americans afflicted with chronic pain, help is delayed, inaccessible or inadequate, the IOM found."). Illegal trade in the drugs has also been suggested by some to result, in part, from some physician's reluctance to prescribe. Those patients who have legitimate need for the drugs but are denied them by their primary care physicians may seek them out through criminal means. *See* David B. Brushwood, *Important Lessons from a Physician's Conviction for Drug Diversion*, Pain & The Law, http://www.painandthelaw.org/mayday/brushwood _030602.php (last visited Aug. 4, 2011) ("The reluctance of primary care physicians to meet patients' needs for pain medications may push patients toward such unlawful practices.").

Opposing the pressure placed on physicians by government regulation not to prescribe opioid painkillers is physicians' basic obligation to relieve suffering. The American Medical Association's *Code of Medical Ethics* does not articulate a general obligation on the part of physicians to treat patients' chronic pain. It states only that "[p]hysicians have the responsibility to relieve pain and suffering and to promote the dignity and autonomy of *dying patients* in their care." *Id.* (emphasis added). But, despite the Code's explicit focus on treating the pain of terminally ill patients, the medical community agrees that its ethical obligations extend to treating the chronic pain of non-terminally ill patients as well. *See* Payne, *supra*, at 27 ("[T]here is universal acknowledgment and overwhelming consensus of all major medical organizations and societies of the ethical imperative of physicians to attend to human pain and suffering." (citation omitted)); *see also id.* at 29 ("[Physicians] have a professional, ethical, and moral obligation to assess, attend to, and relieve pain and suffering in individual patients whom we care for."); Steven D. Passik & Kenneth L. Kirsh, *Double Standard for Access to Pain Management*, 10 Am. Med. Ass'n J. Ethics 49, 49 (2008) ("[B]eneficence dictate[s] that opioids [can] not be ethically withheld in many clinical circumstances.").

The physicians' Hippocratic Oath to do no harm sometimes requires withholding of opioid painkillers from patients, lest they should do harm by facilitating a dangerous addiction. As one commentator has described the interaction between physicians' obligation to treat a patient's suffering while also causing no harm to the patient:

> [P]rofessionals who treat pain find themselves at a crossroads: in many respects opioids are still the best pain relief medications we have . . . . Yet we have realized that their wider use does pose a serious risk of addiction for certain vulnerable individuals. Paying proper attention to the downside means that in some situations the worst thing physicians could do—ethically—would be to deny opioids; in other circumstances, it would be to provide access to them.

Passik & Kirsh, *supra*, at 50 (footnote omitted). "Today, all practitioners involved in pain management have the dual mission of relieving suffering while avoiding contributing to drug abuse and diversion." Kirsh et al., *supra*, at 6.

Navigating the sea of ethical and legal obligations surrounding opioid prescription is complicated by the difficulty inherent in accurately assessing a patient's pain. *See generally* Beck, *supra* (discussing the problems faced by physicians in diagnosing and treating chronic pain with opioid pain medications). A doctor must first determine whether the claimed pain is real or is feigned in order to obtain a prescription. But "[e]ven when pain is real, [it is] highly subjective." *Id.* The subjective nature of pain makes not only diagnosing it hard but also treating it difficult. *See* Amy Young, *Federal Agencies Monitor Physician Prescribing for Pain*, 6 Am. Med. Ass'n J. Ethics (2004), *available at* http://virtualmentor.ama-assn.org/2004/01/hlaw1-0401.html ("It is not always easy to pinpoint the cause of pain and, when you manage to do so, the treatment problems begin. Individual patients react to pain relievers differently. Finding the proper pain relief and the correct dosage for a given patient can be tricky. The only true measure of pain severity is the patient's reported experience.").

Physicians thus find themselves in a precarious position when considering prescribing opioid painkillers. "With the increasing pressure of regulatory scrutiny and [a] duty to treat pain but contain abuse or diversion, [physicians] often feel that they must avoid being duped by those abusing prescription pain medications at all costs." Kirsh et al., *supra*, at 6. *But see* Rigg et al., *supra* (concluding from a study conducted by interviewing thousands of patients Florida pain clinics that pain physicians are often lax in their evaluating and prescribing habits).

## B. Physicians' Obligations in Prescribing

A physician "has an obligation to be thorough, thoughtful, logically consistent, and careful (not to mention humane and caring), but not necessarily right." Kirsh et al., *supra*, at 6. These and other fundamental obligations are found in one form or another throughout the medical literature on opioid prescription, and, significantly in the guidelines issued by several prominent medical organizations and associations for proper use of opioids in treatment of chronic pain. Many of the obligations and the guidelines creating them are instructive of the difficulties ethical medical professionals face.

A physician's first obligation under the guidelines is to perform a thorough evaluation of a patient before prescribing opioid pain medication. This duty is recognized in the Federation of State Medical Boards' *Model Policy for the Use of Controlled Substances in the Treatment of Pain* ("*Model Policy*"), which has been endorsed by the American Academy of Pain Medicine, the DEA, the American Pain Society, and the National Association of State Controlled Substances Authorities. The *Model Policy* guideline for evaluating a patient before prescribing a controlled substance such as an opioid painkiller reads as follows:

> A medical history and physical examination must be obtained, evaluated, and documented in the medical record. The medical record should document the nature and intensity of the pain, current and past treatments for pain, underlying or coexisting diseases or conditions, the effect of the pain on physical and psychological function, and history of substance abuse. The medical record also should document the presence of one or more recognized medical indications for the use of a controlled substance.

*Id.* at 3. Of note is the guideline's direction to document any history of substance abuse or current indications for the use of a controlled substance. That direction also establishes a physician's obligation to attempt to identify a patient for whom opioid therapy may not be appropriate in the first place.

The American Pain Society's *Clinical Guidelines for the Use of Chronic Opioid Therapy in Noncancer Pain* ("*Pain Society Guidelines*") is in accord with the *Model Policy*, recommending that physicians perform thorough evaluations of patients before prescribing opioids. *Pain Society Guidelines* Recommendation 1. In addition, the *Pain Society Guidelines* recommend that a physician should conduct a comprehensive benefit-to-harm analysis, in which is weighed the potential harm to the patient from a course of treatment involving opioids against the potential benefit from such a course of treatment. *Id.* Tools identified by the *Pain Society Guidelines* as being most helpful in assessing the potential for harm to the patient from addiction to the medication include the Screener and Opioid Assessment for Patients with Pain ("SOAPP") Version 1, the revised SOAPP, the Opioid Risk Tool, and the Diagnosis, Intractability, Risk, Efficacy instrument. *Id.* The *Pain Society Guidelines* requires physicians to evaluate a patient's underlying pain condition prior to prescribing opioids by obtaining appropriate diagnostic tests such as MRIs and x-rays. *Id.*

Thorough pre-prescription evaluation of patients incorporating both diagnostic tests and risk assessment tools is supported by the American Society of Anesthesiologists' *Practice Guidelines for Chronic Pain Management* ("*ASA Practice Guidelines*"); the Institute for Clinical Systems Improvement's *Assessment and Management of Chronic Pain* ("*ICSI Guidelines*") guidelines; and the United States Veteran Administration's *Management of Opioid Therapy for Chronic Pain* ("*VA Guidelines*") guidelines.

A physician's second obligation under the guidelines is to obtain informed consent and to work with a patient in developing a written opioid treatment plan, which should include entering into an opioid treatment agreement, or "contract," with the patient. *See* Mark D. Sullivan, *Negotiate with Patients on Treatment of Pain*, Am. Med. Ass'n News Ethics Forum,

http://www.ama-assn.org/amednews/2006/04/03/prcb0403.htm (last visited Aug. 4, 2011). The informed consent discussion should involve a conversation about of the risks of opioid use. *Model Policy* at 4 ("The physician should discuss the risks and benefits of the use of controlled substances with the patient . . . ."); *Pain Society Guidelines* Recommendation 2; *ICSI Guidelines* Recommendation 19; *see also VA Guidelines* at 30 ("It is important for the clinician to accompany any prescription for opioids with at least one informational session in which the patient can express concerns, ask question, and be appropriately informed about adverse effects, tolerance, risks of addiction and ways of preventing difficulties in opioid management."). The written treatment plan and agreement should, first and foremost, outline the plan and "state objectives that will be used to determine treatment success." *Model Policy* at 4. It should also establish the responsibilities of the patient during treatment, as well as clear guidelines "to reinforce expectations about the appropriate and safe use of opioids." *Pain Society Guidelines* Recommendation 2.

In lieu of recognizing one standardized opioid treatment agreement, various guidelines support inclusion of many different terms within a given agreement. Some of the terms designed to prevent the abuse of, and possible addiction to, opioid pain medications are:

(1) the requirement that the patient obtain opioids from only one prescriber, *Pain Society Guidelines* Recommendation 2; *VA Guidelines* at 32;

(2) the limitation that the patient may only fill their prescriptions at one designated pharmacy, *Pain Society Guidelines* Recommendation 2; *see also ICSI Guidelines* Key Implementation Recommendation 5 ("Establish a policy for monitoring and maintain opioid agreements for prescription refills with other clinics, pharmacies, dentists and specialists.");

(3) the proscription against the patient changing dosage without first discussing it with the physician, *VA Guidelines* at 32;

(4) the prohibition against "selling, lending, sharing or giving any medication to others," *Id.*;

(5) limitations on the number and frequency of refills, and on the manner in which patients may obtain refills, *Model Policy* at 4; *Pain Society Guidelines* Recommendation 2; *VA Guidelines* at 32;

(6) procedures for monitoring the patient's adherence to the treatment plan, which could include random urine drug testing, pill counts, and office visits at a specified minimum interval, *Model Policy* at 4; *Pain Society Guidelines* Recommendation 2; *VA Guidelines* at 32; *see also ICSI Guidelines* Key Implementation Recommendation 6 ("Develop a process for scheduling follow-up patient visits to deter drug-seeking behaviors with other care providers."); and

(7) ramifications for breaching the treatment agreement, *Model Policy* at 4; *Pain Society Guidelines* Recommendation 2; *VA Guidelines* at 32.

The third important physician obligation is active monitoring of a patient's use of prescribed opioids for deviation from a treatment plan or violation of the terms of a treatment agreement. *See Model Policy* at 4; *Pain Society Guidelines* Recommendations 5–7; *ICSI Guidelines* Recommendation 19 ("[C]areful patient selection and close monitoring of all nonmalignant pain patients on chronic opioids is necessary to assess effectiveness and watch for signs of abuse."); *VA Guidelines* at 55–59; *see also ASA Guidelines* Recommendation III ("A strategy for monitoring and managing side effects, adverse effects, and compliance should be considered for all patients undergoing any long-term pharmacological therapy."). Monitoring a

patient is important because "adherence to [a] treatment plan is likely to be associated with positive outcomes," whereas "[n]onadherence may result from a variety of causes including . . . addiction . . . or pursuit of financial gain (diversion)." *VA Guidelines* at 56.

Regular follow-up consultations are considered essential to effective supervising of patients for adherence to treatment plans and agreements and, concomitantly, to avoid opioid misuse or abuse. *See Model Policy* at 4; *Pain Society Guidelines* Recommendation 5 ("Monitoring that involves regular, repeated evaluations and addresses a variety of domains is likely to be more informative than infrequent, narrowly focused evaluations."); *VA Guidelines* at 82 ("The goal of stable relief of pain and management of adverse effects depends on a regular evaluation of the patient's status."); *ASA Guidelines* Recommendation II ("A long-term approach that includes periodic follow-up evaluations should be developed and implemented as part of the overall treatment strategy."); *ICSI Guidelines* Recommendation 19 ("[C]areful patient selection and close monitoring of all nonmalignant pain patients on chronic opioids is necessary to assess effectiveness and watch for signs of abuse."). At each visit, a physician should assess and document the patient's "pain severity and functional ability, progress toward achieving therapeutic goals, and presence of adverse effects." *Pain Society Guidelines* Recommendation 5; *see also Model Policy* at 4. In addition, "aberrant drug-related behaviors, substance use, and psychological issues" should also be assessed and documented. *Pain Society Guidelines* Recommendation 5. Aberrant drug-related behaviors that are suggestive of opioid abuse or addiction include:

> [1] using opioids for reasons other than pain (such as to "get high" or "manage stress"), [2] rapidly escalating demands for dose increases, or unusual increase in doses, [3] observed or reported intoxication or unexplained withdrawal symptoms, [4] repeatedly reporting that opioid medication was lost, stolen or destroyed; [5] injection of opioids; [6] threatening or harassing staff; [7]

repeatedly seeking prescriptions from other providers or emergency rooms; [8] and alteration, borrowing, stealing or selling prescriptions.

*VA Guidelines* at 58.

The appropriate frequency of return visits is, under the guidelines, dependent on the particular patient and the number and severity of aberrant behavior he or she exhibits. For those patients with the highest risk of abuse, weekly consultations may be appropriate, *Pain Society Guidelines* Recommendation 5; for others, the frequency may appropriately be less often, *id.*

Because "[t]he patient who misuses substance[s] often gives inaccurate information regarding substance use," random urine tests "are recommended for all patients with chronic pain prior to and during opioid therapy." *VA Guidelines* at 59, 60. The tests are used "(1) to check for diversion, seeking evidence the patient is taking the medication being prescribed; (2) to check for drugs of abuse; and (3) to test for the presence of the prescribed drug." *ICSI Guidelines* Recommendation 19. Random urine testing is an important part of any physician's overall strategy for monitoring a patient's opioid use. Multiple studies have shown that employing random urine testing can, when performed and interpreted properly, allow a physician to more accurately identify when patients are abusing prescribed opioids or are using other drugs in conjunction with prescribed opioids. *See VA Guidelines* at 60 (summarizing and discussing the results of several studies).

An important element of effective monitoring of patients is close consultation between the patient's primary care physician and the physicians to whom the patient has been referred for specialized treatment. Some support exists in the guidelines for the proposition that a primary care physician should oversee the administration of opioid medications. *See ICSI Guidelines* Recommendation 19 ("[A] single physician/provider should prescribe and supervise opioids used for chronic non-cancer pain. Often the primary care provider is best suited to do so based on

knowledge of the whole person."); *VA Guidelines* at 81.  There is general agreement among the guidelines that high-risk patients or patients who have demonstrated behaviors suggestive of abuse should be referred to a pain or addiction specialist for closer and more particularized management.  *See Model Policy* at 4; *Pain Society Guidelines* Recommendation 6; *VA Guidelines* at 79.  Whether the patient is at high-risk for abuse or not, if referred to a specialist for opioid treatment the guidelines all implicitly, if not explicitly, recognize that the primary care physician should work closely with the specialist in their treatment of the patient.  *See VA Guidelines* at 81 ("Studies show that patients do better when they have continuous access to a clinician who provides comprehensive care for the large majority of their health care needs and who coordinates care when the services of other health care professionals are needed."); *AMA Guidelines* Recommendation I ("Whenever possible, direct and ongoing contact should be made and maintained with the other physicians caring for the patient to ensure optimal care management."); *cf. ICSI Guidelines* Recommendation 24 ("The team should have extensive training and experience in pain management and each professional should be working as part of a multidisciplinary team . . . .").

"The American Board of Internal Medicine's Physician Charter outlines *a professional responsibility* of physicians' to commit to improve quality of care through 'working collaboratively with other professionals to reduce medical error [and] increase safety.'"  Larissa Nekhlyudov, *Following up on Patients Referred to Specialist Care*, Am. Med. Ass'n News Ethics Forum, http://www.ama-assn.org/amednews/2010/12/20/prca1220.htm (last visited Aug. 4, 2011) (emphasis added).  In view of this professional responsibility and the guidelines recommendations, a primary care physician should be expected to work closely with a specialty

physician to whom a patient was referred for opioid therapy to ensure that such therapy is conducted properly.

Physicians are expected to "incorporate safeguards into their practices to minimize the potential for the abuse and diversion of controlled substances." *Model Policy* at 3. Guidelines procedures outline those safeguards. If these safeguards are met, physicians may be shielded from legal liability when they conclude, wrongly, that a patient's pain was sincere but it was feigned in order to obtain a prescription. *See* Brushwood, *supra* ("Physicians who follow minimal standards for prescribing controlled substances to treat pain have been safe-harbored from prosecution in states that have adopted model rules developed by the Federation of State Medical Boards.").

As to possible revocation of a physician's license, the *Model Policy*, which is endorsed by the DEA, states:

> Physicians should not fear disciplinary action from the Board for ordering, prescribing, dispensing or administering controlled substances, including opioid analgesics, for a legitimate medical purpose and in the course of professional practice. The Board will consider prescribing, ordering, dispensing or administering controlled substances for pain to be for a legitimate medical purpose if based on sound clinical judgment.

*Model Policy* at 3. Any state medical board that has modeled its own opioid prescription rules after the *Model Policy* "will judge the validity of the physician's treatment of the patient based on available documentation, rather than solely on the quantity and duration of medication administration." *Id.* And those same medical boards "will not take disciplinary action against a physician for deviating from this policy when contemporaneous medical records document reasonable cause for deviation." *Id.*

### C.  Physicians Who Fail to Satisfy Their Obligations

Despite the protection that the guidelines procedures can provide physicians, there is evidence that many physicians involved in treating pain often do not follow them.  *See* Rigg et al., *supra*; *see also* Friedman, *supra* ("A 2004 survey of physicians found that 43 percent did not ask about prescription-drug abuse when taking a patient's history, and one third did not regularly call or obtain records from a patient's previous physician before prescribing potentially addictive drugs.  These alarming data suggest that physicians are much too lax in prescribing controlled drugs."); *Doctors Abandoning Their Oaths*, BuffaloNews.com, http://www.buffalonews.com/ city/special-reports/rx-for-danger/article368425.ece (last visited Aug. 4, 2011).

One recent study examined the prescribing practices of pain clinics in South Florida, an area regarded by both researchers and law enforcement agencies alike as a major source of illicit opioid pain medication along the eastern seaboard.  NDIC 2010 Report, *supra*, at 44 (finding that in Broward and Palm Beach Counties the number of pain clinics grew from four to 115 between 2007 and 2009, and that in one six-month period clinic physicians in that area dispensed more than nine million tablets of oxycodone); Rigg et al., *supra*; *see also* Don Van Natta, Jr., *22 Arrested as Federal Agents Raid Florida Clinics in Prescription Drug Crackdown*, N.Y. Times, Feb. 24, 2011, at A16.  The study was conducted by interviewing a diverse group (although not statistically valid sample) of addicts about its experiences obtaining prescriptions from clinic physicians in South Florida.  Several common practices among the worst of the offending pain clinics were identified.  Of particular interest were the practices contrary to the guidelines procedures for prescribing opioid medications.

First, the study found that many clinics did not engage in the thorough patient evaluation that should be a prerequisite for issuing a prescription for opioid pain medication.  Some clinic

physicians appear to have gone further than merely failing to conduct an evaluation; they went so far as to actively *ignore* obvious warning signs of addiction.  As one interviewee stated:

> They knew [the medications] were being abused, but nothing is ever spoken.  I weighed about 90 pounds.  I was so sick, and my blood pressure was so low it was bottoming out.  I was having seizures.  My physical health just deteriorated.  I mean, it's obvious if you walk in, you can tell if someone is an active crack heard or actively abusing pills.

Rigg et al., *supra*.  Another interviewee commented on the ease of obtaining a prescription with falsified records:

> You go in there and you don't even need to have—the X-rays don't even need to be legit.  I went in there with my girlfriend's mother's x-rays.  I took a black permanent marker and put (name) on top of it, handed it to the doctor, and he's like, "So what do you want?  You have pain?"

*Id.*

Second, according to the study many clinic physicians prescribed freely and in large quantities.  The authors of the study had the following to say about physicians' liberal prescribing habits:

> Almost all of the participants talked about the liberal prescribing habits of pain management doctors as an appealing attribute of pain clinics.  Terms such as "easy," "liberal," and "loose" were all used by abusers to describe how easily pain doctors wrote prescriptions relative to "regular" doctors (e.g. primary care physicians). . . .  All participants felt that pain management doctors were far more comfortable prescribing the stronger types of prescriptions medications that they desired.  In fact, the overwhelming majority of participants exclusively sought drugs from pain management doctors for this very reason.

*Id.*  And as to the large quantity of pills prescribed by many physicians, the authors noted that

> [p]articipants themselves were often surprised at how much medication pain doctors would prescribe them and how easy it was for them to get it. . . . Not surprisingly, participants rarely complained about not being able to obtain enough pills to satisfy their habit. A more common occurrence was for participants to have such an abundance of prescription drugs that they were able to sell off their "extra" pills to help pay for their next visit to the doctor as most pain clinics did not accept health insurance and required cash payments.

*Id.*

A study of Philadelphia-area pain clinics also concluded that some physicians "are not aggressive in pursuing monitoring strategies that could help prevent misuse and diversion." Kevin B. O'Reilly, *Opioid Prescribing Requires Close Patient Monitoring*, Am. Med. Ass'n News, http://www.ama-assn.org/amednews/2011/03/21/prsb0321.htm (last visited Aug. 4, 2011). Among the disturbing results of that study are:

> [J]ust 8% of 1,612 patients prescribed opioids by 203 physicians at eight Philadelphia-area clinics from 2004 to 2008 underwent urine drug screening during their treatment. Less than a quarter of the highest-risk patients were tested to see whether they were taking their medicines or using illicit substances. Less than half of all patients were seen at least once every six months, whereas about 53% of the riskier drug-history patients were seen that often.

*Id.* (summarizing the results of Joanna L. Starrels et al., *Low Use of Opioid Risk Reduction Strategies in Primary Care Even for High Risk Patients with Chronic Pain*, --- J. Gen. Internal Med. --- (forthcoming 2011), *available at* http://www.ncbi.nlm.nih.gov/pubmed/21347877). These results ran contrary to the guidelines' ideal—and the study's hypothesis—that higher-risk patients would be subjected to closer supervision by the physicians prescribing them opioid painkillers. *See Pain Society Guidelines* Recommendation 5–6.

Taken together, and in conjunction with other research on the topic, the South Florida and Philadelphia studies suggest that while many physicians do adhere to legitimate opioid prescribing practices, there are a significant number who contribute to abuse through lax prescribing. As one physician observed, "[b]ad doctors make good doctors look bad. . . .

Physicians need not fear prescribing necessary pain medications for patients. . . .  Human

suffering can be relieved through appropriately prescribed pharmaceutical products, and the

diversion of controlled substances to illicit uses can be prevented at the same time."  David

Brushwood, *Important Lessons from a Physician's Conviction for Drug Diversion*, Pain & The

Law, http://www.painandthelaw.org/mayday/brushwood_030602.php (last visited Aug. 4, 2011).

### D.      Legal Consequences for Physicians Who Fail to Satisfy Their Obligations

The legal consequences for not following appropriate procedures to safeguard against

abuse are real.  If a physician prescribes too freely, without providing for a detailed evaluation of

a patient and subsequent abuse detection and prevention measures such as frequent urinalysis

testing, or prescribes in large quantities without documenting a legitimate need for doing so,

prosecution for illegal distribution of the drug may follow.  *See United States v. Lanting*, 10-CR-

998 (2010) (alleging 3,029 prescriptions issued during the months of April 2010 through

November 2010); Wilson, *supra*.  Patient examinations by Dr. L. were, according to the Federal

Bureau of Investigation, "perfunctory at best, consisting of a quick once-over with a stethoscope,

and often not even that, and they lasted about a minute," Wilson, *supra*; pre-prescription

diagnostic tests also allegedly were not performed, *id.*; and patients often "gave [him] fake

M.R.I. reports, sometimes with a name different from their own, and he sent them on their way

with a prescription," *id.*

Where a patient dies of an overdose, the prescribing physician may also be criminally

prosecuted for the death.  The first, and perhaps still most famous, case in which a physician was

successfully convicted on such charges is that of Florida doctor James Graves.  Four of Dr.

Graves's patients died of overdoses to the oxycodone he had been prescribing them.  Young,

*supra*.  The Florida State Attorney General's office conducted an investigation into Dr. Graves's

opioid prescribing habits and, upon conclusion of that investigation, charged him with manslaughter, racketeering, and delivery of a controlled substance. *Id.* Previous attempts to prosecute physicians for their patients' overdose deaths failed on the element of causation. *Id.* "[P]hysicians argued successfully that a patient's choice to abuse medications was an intervening cause that eliminated the physician's responsibility for an overdose death of a patient." *Id.* That argument did not persuade the judge or jury in Dr. Graves's case, however. He was convicted of manslaughter for the overdose deaths of his patients, as well as for racketeering and illegal delivery, and sentenced to sixty-three year's incarceration. *Id.*

Although it was argued that Dr. Graves was running a "pill mill," and the jury agreed, Dr. Graves maintained that he was simply treating patients' legitimate pain. He defended his prescribing practices, saying that he did not intentionally contribute to his patients' opioid abuse, but rather that "his patients lied to him to obtain prescriptions, did not take medications according to his instructions, and, in some cases, abused alcohol while taking medications." *Id.*

### E.   Pressures Placed on Pharmacists in Filling Prescriptions

When considering whether to fill a prescription for an opioid painkiller, pharmacists find themselves subject to pressures similar to those placed on physicians when initially deciding to issue the prescription. The pharmacist's constraints derive from their legal and ethical obligations. Legally, a pharmacist must adhere to federal as well as state regulations governing pharmacies and their dispensing of Schedule II drugs. NDIC 2009 Report, *supra*, at 1; *see also infra* Part VI. Adherence to federal regulations includes "registering with the DEA and complying with a series of requirements related to drug security and records accountability." NDIC 2009 Report, *supra*, at 1; *see also* David B. Brushwood, *From Confrontation to Collaboration: Collegial Accountability and the Expanding Role of Pharmacists in the*

*Management of Chronic Pain*, 29 J. L. Med. & Ethics 69, 71 (2001) [hereinafter Brushwood,

*Confrontation to Collaboration*] ("The [federal regulatory system] requires registration of those

who may legally possess controlled substances, and it imposes stringent recordkeeping

requirements so that auditors have the ability to track any drug within the system from

manufacture to ingestion."). Failure to comply may result in illegal distribution charges against a

pharmacist; conviction could result in the same penalties as are faced by conventional street-

level drug dealers. *See United States v. Hernandez*, No. 07-60027-CR, 2007 WL 2915854, at *7

(S.D. Fla. Oct. 4, 2007) (collecting cases).

      Fear of investigation by federal or state authorities has proven to be a significant

disincentive to pharmacists in filling prescriptions for opioid painkillers, just as it has proved a

disincentive to physicians to issuing those prescriptions. And fear of robbery—a significant

problem currently faced by pharmacists, *see* Part IV.C, *supra*—has discouraged pharmacists

from carrying opioid painkillers. *See* Hawley, *supra*; Goodnough, *supra*. Excessive deterrence

contributes to the purported under-treatment of chronic pain in the United States.

      Pharmacists act as gatekeepers at "the end of a long chain of drug distribution," which

carries with it the "responsibility to not provide drug diverters with easy access to this closed

system." Brushwood, *Confrontation to Collaboration*, *supra*, at 69. But pharmacists also have a

competing responsibility "to care for patients and to provide drug therapy that is medically

indicated, despite concerns of potential diversion." *Id.* There exists for pharmacists, in short,

"[t]he therapeutic imperative to assure that patients who need pain medications get them." *Id.* at

70. This force acts as a counter-balance to the pressures of intense scrutiny from government

agencies and the threat of violent crime, encouraging pharmacists to fill prescriptions for opioids

in order to alleviate chronic pain.

### F. Pharmacists' Legal Obligations in Filling Prescriptions

Like physicians, pharmacists are subject to several legal and ethical obligations in their dealings with opioid medications like oxycodone and OxyContin. Their legal obligations have grown considerably over the years since the passage of the CSA. *See generally* Brushwood, *Confrontation to Collaboration*, *supra*. Under the CSA, pharmacists must register with the DEA and adhere to the other requirements of that agency's regulations concerning the filling of prescriptions for Schedule II drugs. NDIC 2009 Report, *supra*, at 1. In addition, they must satisfy any state laws governing pharmacies and the dispensing of controlled substances or risk investigation and prosecution. *Id.*

One of a pharmacist's basic legal obligations in preventing of opioid abuse is to assure that all opioid prescriptions are issued for a legitimate medical purpose. 21 C.F.R. § 1306.04; *see also* David B. Brushwood, *For Relief of Pain: Know the Federal Rules for Dispensing Controlled Substances*, Pain & The Law, http://www.painandthelaw.org/mayday/brushwood _070102.php (last visited Aug. 4, 2011) [hereinafter Brushwood, *Know the Federal Rules*]. Exactly what a pharmacist must do to satisfy this obligation varies according to the situation, but at the minimum requires a pharmacist to identify "obvious indicia of invalidity." Brushwood, *Confrontation to Collaboration*, *supra*, at 71. Although a pharmacist need not question the validity of every opioid prescription, *id.* at 72, "[i]nsisting on verification of a prescription for an unknown patient by an unknown physician is perfectly reasonable," Brushwood, *Know the Federal Rules*, supra, at 1. "The pharmacist's responsibility to verify a suspicious prescription can be met by contacting the prescriber, but this is far easier said than done. Physicians are busy, they are difficult to locate, and they often do not regard pharmacist verifications as a high

priority task."  David B. Brushwood, *Fraudulent Arrest, Valid Prescription*, Pain & The Law, http://www.painandthelaw.org/mayday/brushwood_021903.php.

Pharmacists may also be required to make an independent verification of the "therapeutic appropriateness of medications legitimately prescribed for patients."  Brushwood, *Confrontation to Collaboration*, *supra*, at 73.  *But see* 25 Am. Jur. 2d *Drugs and Controlled Substances* § 249 (2011) ("While there is language in some opinions to the contrary, generally, a pharmacist does not have a duty to question a judgment made by a physician as to the propriety of a prescription." (footnotes omitted)).  Problems that a pharmacist may be required to identify include "therapeutic duplication, drug-disease contraindications, drug-drug interactions, incorrect dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse/misuse."  Brushwood, *Confrontation to Collaboration*, *supra*, at 74.  The focus is patient safety, which requires taking reasonable steps to prevent abuse of prescription opioids.

Generally, pharmacists are not legally obligated to inform patients verbally of potential adverse effects of a drug, including addiction, if the drug has been legitimately prescribed.  25 Am. Jur. 2d *Drugs and Controlled Substances* § 250.  Nor do pharmacists generally have a legal obligation to warn a patient of the dangers by way of the manufacturer's package insert.  *Id.* § 252.  Moreover, a pharmacist is not legally obligated to warn a patient's physician if the pharmacist suspects the patient is addicted to the prescribed medication.  *Id.* § 248.

Pharmacists' ethical obligations in filling opioid prescriptions are not as clearly ascertainable as those of physicians in issuing opioid prescriptions.  But, importantly, the American Pharmacists Association's *Code of Ethics for Pharmacists* obligates pharmacists to consider the impact of filling a particular prescription not only on the individual but on society at large.  Am. Pharm. Ass'n, *Code of Ethics for Pharmacists* ¶ 7 ("The primary obligation of a

pharmacist is to individual patients. However, the obligations of a pharmacist may at times extend beyond the individual to the community and society. In these situations, the pharmacist recognizes the responsibilities that accompany these obligations and acts accordingly."); *see also* Pharmacy Ethics 14 (Mickey Smith et al. eds., 1991) ("Pharmacy has for its primary object the service which it can render to the public in safeguarding the handling, sale, compounding and dispensing of medicinal substances. . . . [T]he States expect the Pharmacist to recognize his responsibility to the community and to fulfill his professional obligations honorably and with due regard for the physical well being of society."). What is best for society or for the community may, in some instances, be to refuse to fill an opioid prescription; in still other instances, it may be to fill it.

### G. Medical Community's Response to Addiction

Medical researchers and physicians have both recognized that an opioid abuse and addiction problem does in fact exist in the United States. *See* Kirsh et al., *supra*, at 6. In response, some segments of the medical profession have taken recent steps to address the larger problem of addiction—not just to opioids, but to all addictive drugs. By introducing residency programs devoted to the study of addiction, several medical schools and hospitals hope to "establish addiction medicine as a standard specialty along the lines of pediatrics, oncology or dermatology." *See* Douglas Quenqua, *Medicine Adds Slots for Study of Addictions*, N.Y. Times, July 11, 2011, at A11.

## VI. Government Regulation of Oxycodone and OxyContin Prescribing

### A. Federal Government Regulation

Under the Federal Controlled Substances Act (CSA) of 1970, 21 U.S.C. § 801 *et seq.* (2006), the DEA is granted the authority to promulgate regulations setting the standards of

production and distribution of opioids.  *Controlled Substances Legislation*, Pain & The Law, http://www.painandthelaw.org/statutes/controlled_subs_stats.php (last visited Aug. 4, 2011).  "U.S. federal drug laws embody a dual imperative to ensure the availability of controlled substances for medical and scientific purposes, while at the same time to prevent their diversion and abuse."  David E. Joranson et al., *Trends in Medical Use and Abuse of Opioid Analgesics*, 283 J. Am. Med. Ass'n 1710, 1710 (2000) (footnote omitted).  For example, § 801(1) of the CSA states that "many of the drugs included within this subchapter have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people."  The DEA's prescribing regulation notes that "[t]his section is not intended to impose any limitations on a physician . . . to administer or dispense [including prescribe] narcotic drugs to persons with intractable pain in which no relief or cure is possible or none has been found after reasonable efforts."  21 C.F.R. § 1306.07(c).  Still, the federal government, through the CSA and the DEA's regulations, imposes significant limitations on who can issue and fill opioid prescriptions and how.

The CSA states that, with exception for some emergency situations, "no controlled substance in schedule II . . . may be dispensed without the written prescription of a practitioner." 21 U.S.C. § 829(a); *see also* 21 C.F.R. § 1306.11(a) ("A pharmacist may dispense directly a controlled substance listed in Schedule II that is a prescription drug . . . only pursuant to a written prescription signed by [a] practitioner . . . .").  A physician, in order to prescribe a controlled substance, must be authorized to do so by the state in which he is licensed and be registered with the DEA.  21 C.F.R. § 1306.03(a)(1)–(2).  All prescriptions for controlled substances must "[1] be dated as of, and signed on, the day when issued and . . . bear the [2] the full name and address of the patient, [3] the drug name, strength, dosage form, quantity prescribed, directions for use,

and [4] the name, address and registration number of the practitioner." *Id.* § 1306.05(a). They can only be filled by a pharmacist registered with the DEA and during "the usual course of his professional practice." *Id.* § 1306.06. No refills are permitted for prescriptions for controlled substances listed in Schedule II, including oxycodone and OxyContin. *Id.* § 1306.12(a). Nevertheless, a physician may, if he or she concludes that it will not "create an undue risk of diversion or abuse" and it is permitted by the applicable state law, *id.* § 1306.12(b)(1)(iii), (iv), issue multiple prescriptions for a Schedule II drug at one time, *id.* § 1306.12(b)(1). The physician must, however, indicate on each prescription the earliest date on which a pharmacy may fill it. *Id.* § 1306.12(b)(1)(ii). Pharmacists, in turn, may not fill those prescriptions before the date indicated. *Id.* § 1306.14(e). When a pharmacist fills a written prescription for a Schedule II drug, he must "affix to the package a label showing date of filling, the pharmacy name and address, the serial number of the prescription, the name of the patient, the name of the prescribing practitioner, and directions for use and cautionary statements, if any, contained in such prescription or required by law." *Id.* § 1306.14(a). All registered physicians and pharmacists are subject to extensive recordkeeping requirements. *Id.* § 1304.04(f)–(h). The DEA actively enforces all of these regulations. *See generally* Libby, *supra* (detailing the DEA's aggressive enforcement campaigns).

Beyond such regulations of physicians' and pharmacists' practices, the federal government has taken recent steps to specifically combat the threat of OxyContin abuse at the user level. In April 2010, the FDA approved a new formulation of OxyContin that is designed to prevent abuse of that drug. Goodnough & Zezima, *Harder to Abuse*, *supra*. The required new formulation causes OxyContin pills to turn into a gummy substance when users try to crush

them.  *Id.*  This substance is more difficult to snort, inject, or chew, in turn making the OxyContin more difficult to abuse.  *Id.*

On April 19, 2011, the White House announced the first-ever comprehensive federal plan to combat prescription drug abuse.  The Associated Press, *U.S. Targets "Pill Mills," Prescription Abuse*, Charleston Daily Mail, Apr. 20, 2011, at 3A.  It focuses on four main areas. The first is education, both for prescribing physicians and the public.  *Id.*  "[T]he plan calls for Congress to require a certain amount of training on responsible prescription practices for medical practitioners who seek DEA registration to prescribe certain controlled substances."  *Id.*  As to educating the public, it provides for a "national education campaign featuring [advertisements such as] the famous frying-egg 'this is your brain on drugs' ad used in past antidrug efforts."  *Id.* Second, established is a prescription tracking database in all fifty states.  *Id.*  Third, improved law enforcement training and more aggressive law enforcement efforts against illegal pill mill clinics are emphasized.  *Id.*  Fourth, required are better methods for disposing of unused or expired prescriptions.  *Id.*  Federal lawmakers hope that these changes will help cut prescription drug abuse in the United States by approximately fifteen percent over the next five years.  *Id.*

### B.    State Government Regulation

In addition to nationwide regulation of prescription drugs by the federal government, individual states have their own policy regarding physicians' prescribing and pharmacists' dispensing of drugs.  *See State Pain Policies Regulations*, Pain & The Law, http://www.painandthelaw.org/statutes/painpolicy_regulations.php (last visited Aug. 4, 2011) (listing each state's prescription drug policies or regulations).  Physicians and pharmacists must be cognizant of the prescribing rules of the state in which they practice as well as those of the federal government and its agencies.

Thirty-five states have enacted detailed prescription drug monitoring programs ("PDMPs"). *Q&A – State Prescription Drug Monitoring Programs*, Office of Diversion Control, DEA, http://www.deadiversion.usdoj.gov/faq/rx_monitor.htm (last updated June 2011) (listing states). Thirteen other states authorize PDMPs not yet operational. *Id.*

"The primary tool for [prescription opioid] diversion control at the medical system level occurs by . . . [PDMPs]." Fisher et al., *supra*, 414. PDMPs are "database[s], centralized by each state, and administered by an authorized state agency to facilitate the early detection of trends in [prescription drug] diversion and abuse." NDIC 2009 Report, *supra*, at 16 n.31. They allow early detection of diversion and abuse by collecting data on substances dispensed in the state, including "the physician visited, the number of times the physician is visited, the drugs for which each individual receives a prescription, the quantity of drugs prescribed, and the pharmacy or pharmacies that fill the prescriptions." *Id.*

> Each state is responsible for determining how prescription information will be gathered and shared with other states. For example, one state's PDMP may decide to limit sharing its information with only law enforcement, treatment providers, physicians and pharmacists. Similarly, a state's PDMP may choose to share all its information with all other agencies within the state, which could provide a collaborative effort against prescription drug diversion. For example, Colorado shares prescription data information with the DEA and the NABP, whereas other states allow officials working on Medicaid program or fraud issues to use PDMP information.

Monica Kim Sham, *Down on the Pharm: The Juvenile Prescription Drug Abuse Epidemic and the Necessity of Holding Parents Criminally Liable for Making Drugs Accessible in Their Homes*, 27 J. Contemp. Health L. & Pol'y 426, 449 (2011) (internal quotation marks and footnotes omitted).

PDMPs are said to significantly improve a state's ability to control the diversion and abuse of prescription drugs within its borders. *See* Ronald Simeone & Lynn Holland, U.S. Dep't

of Justice, *An Evaluation of Prescription Drug Monitoring Programs* (2006) ("The aggregate model suggests that PDMPs reduce the per capita supply of prescription pain relievers and stimulants and in so doing reduce the probability of abuse for these drugs. . . . The individual response model confirms these findings."); U.S. Gov't Accountability Office, GAO-02-634, *Prescription Drugs: State Monitoring Programs Provide Useful Tool to Reduce Diversion* 3 (2002) ("States with PDMPs have realized benefits in their efforts to reduce drug diversion. These include improving the timeliness of law enforcement and regulatory investigations. . . . In addition, law enforcement officials in [states with PDMPs] view the programs as a deterrent to doctor shopping, because potential diverters are aware that any physician from whom they seek a prescription may first examine their prescription drug utilization history based on PDMP data.").

New York State was the first state to enact a comprehensive PDMP. Fisher et al., *supra*, at 415. Since February 2010, it has provided physicians with direct access to its database. John M. Annese, *New Squeeze on Abusers of Rx Drugs*, Staten Island Live, http://www.silive.com/ news/index.ssf/2010/08/ new_squeeze_on_abusers_of_rx_d.html (last visited Aug. 4, 2011). *But see* NDIC 2009 Report, *supra*, at 16 n.33 ("Most [PDMPs] that do share data require formal requests for the information. Individuals may obtain drugs in multiple states before they are suspected of doctor-shopping, and any formal requests are submitted through the PDMP(s)."). Recent proposals would improve access to New York's PDMP data by making it available online. *See* Yancey Roy, *Bills Would Help Curb Rx Abuse*, Newsday, June 25, 2011, at A03.

Any comprehensive PDMP raises serious privacy questions. *See* Mark Hollis, *Privacy Fears Kill Florida Prescription Database but Health Officials Got More Power to Fight Medicaid Fraud and Prescription Abuse*, Orlando Sentinel, May 1, 2004, at A14 ("Worries about patient privacy drove Floriday legislators . . . to kill a bill calling for a prescription-drug

database."); *cf.* Milt Freudenheim, *And You Thought a Prescription Was Private*, N.Y. Times, Aug. 9, 2009, at BU1.  These issues are beyond the scope of this memorandum.

## VII.    Sentences Imposed

### A.    Sentencing Rules

A sentencing court shall "state in open court the reasons for its imposition of the particular sentence."  18 U.S.C. § 3553(c).  If the sentence is not of the kind prescribed by, or is outside the range of, the sentencing guidelines referred to in section 3553(a)(4), the court shall indicate the specific reasons for imposing a sentence different from the guidelines. 18 U.S.C. § 3553(c)(2).  These "reasons must also be stated with specificity in the written order of judgment and commitment."  *Id.*  Even though the mandatory nature of the guidelines has been excised and they are now "advisory," *see United States v. Booker*, 543 U.S. 220, 245–46 (2005), the sentencing court must still adhere to the requirements of 18 U.S.C. § 3553(c)(2), *United States v. Jones*, 460 F.3d 191, 197 (2d Cir. 2006). The sentencing court's written statement of reasons shall be "a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)."  *United States v. Rattoballi*, 452 F.3d 127, 138 (2d Cir. 2006).  Such a statement should demonstrate that the court "considered the parties' arguments and that it has a reasoned basis for exercising its own legal decisionmaking authority."  *United States v. Cavera*, 550 F.3d 180, 193 (2d Cir. 2008) (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)) (internal quotations and alterations omitted).

As to each defendant, the "nature and circumstances of the offense and the history and characteristics of the defendant" is considered.  *See* 18 U.S.C. § 3553(a)(l).  Respectful consideration is given to the sentencing guidelines, the Sentencing Commission's policy statements, and all other factors listed under 18 U.S.C. § 3553(a) to ensure that the sentence was

"sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  *See* 18 U.S.C. § 3553(a).  Under section 3553, there are two major considerations: specific and general deterrence.  *Id.*  Under our common law tradition, sentencing courts also consider the need to incapacitate criminals and the possibility of rehabilitating them.  *See, e.g.*, Wayne R. LaFave, 1 Substantive Criminal Law 38–39 (2d ed. 2003).

### B.    Hanuka's Sentence

Lior Hanuka pleaded guilty to Count One of a one-count superseding information that charged that between October 2008 and May 2010, he, together with others, possessed with intent to distribute oxycodone, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(c).  A comprehensive presentence report was prepared by this court's Probation Department.

The sentencing proceeding was videotaped in order to maintain an accurate record of the courtroom atmosphere and the factors and considerations that a district court must evaluate in imposing a sentence under 18 U.S.C. § 3553(a).  *See In re Sentencing*, 219 F.R.D. 262, 264–65 (E.D.N.Y. 2004) (utility of videotape on appeal).

The total guideline offense level was found to be twenty-five and the defendant's criminal history category I, yielding a guidelines range of imprisonment of between fifty-seven and seventy-one months.  The calculation of the total offense level included a three-point adjustment for acceptance of responsibility, based on Hanuka's timely pleading guilty.  If Hanuka was to be sentenced to a term of imprisonment, the offense required a minimum term of supervised release of three years.  21 U.S.C. § 841(b)(1)(c).  A minimum term of imprisonment was not required, but the maximum was twenty years.  *Id.*  It was conceded by the defendant, and the government, and the court found, that all statutory requirements for the "safety valve" under 18 U.S.C. § 3553(f) had been met, so the statutory minimum sentence of supervised release did

not apply.  The guidelines range of fine was from $10,000 to $1,000,000.  A required $100 special assessment was imposed.  No fines were imposed because the defendant does not have any substantial assets, and it is unlikely that he will have any in the near future.

Hanuka was sentenced to five years' probation.  Transfer of this case for supervision was ordered to the district of Florida, where the defendant lives and works.  The court required close control of the defendant by the Probation Department, with psychiatric and drug and alcohol treatment.  The Probation Department was ordered to impose a curfew on the defendant for the first six months of probation, which should be designed so as not to interfere with the defendant's continued employment.

The court imposed a non-guideline sentence under 18 U.S.C. § 3553(a) and *Booker*.  In so doing, it considered the "nature and circumstances of the offense and the history and characteristics of the defendant."  *See* 18 U.S.C. § 3553(a)(1).  Hanuka's crime was undoubtedly serious, as was evident from the devastating effects oxycodone had on his own life, and by the impact that drug has on families and communities across the United States.

The government argues, Hanuka Tr. 18:24–25, and this court agrees, that Hanuka's addiction drove the instant offense.  Addiction arose from medications that were prescribed lawfully, and with medical justification for pain caused by trauma.  Though there is circumstantial evidence that defendant was prepared to sell the drug illegally, there is no direct evidence of instances of actual distribution of the drug or of any gang activity or violence related to distribution.

Hanuka has taken substantial steps toward rehabilitation.  He has established a successful career in Florida and attends a substance abuse treatment program there, both despite the recent death of his fiancé.  His family support is firm and intelligent.  In light of these factors, a

sentence of five-year's probation reflects the seriousness of the offense and will promote respect for the law and provide just punishment.  *See* 18 U.S.C. § 3553(a)(2)(A).

General deterrence is accomplished.  The sentence will send a clear message that any involvement in the distribution of prescription drugs such as oxycodone will result, at the very least, in a substantial restriction of freedom.  Specific deterrence will be achieved through an extended period of monitoring by probation and a curfew that imposes significant limitations on the defendant's activities unrelated directly to work or rehabilitation.  It is unlikely that he will engage in further criminal activity because of his demonstrated commitment to rehabilitation.

### C.     Ilayayev's Sentence

On March 28, 2011, Andrew Ilayayev pleaded guilty to violation Charge Two and Four of a four-charge violation of supervised release.  Charge Two alleged that on July 7, 2010, Ilayayev violated the court-ordered standard condition of supervised release that he "shall not commit another federal, state or local crime."  Violation Report at 5.  Charge Four alleged that Ilayayev violated the standard condition of supervised release that he "shall notify the Probation Department of any arrest or contact with law enforcement within 72 hours."  *Id.* at 7.  He was charged with failing to notify the Probation Department of the arrest charged in Charge One.  *Id.* The court adopts the violation of supervised release report without change.

Ilayayev was sentenced for the violation on June 30, 2011.  The proceeding was videotaped.  *See* reasons in Part VII.B, *supra*.

Upon a finding of violation of supervised release, the court may continue the defendant on supervised release with or without modifying or enlarging conditions.  It may also extend the term of supervised release, if less than the maximum has already been imposed.  *See* 18 U.S.C. § 3583(e)(2).  Alternatively, under 18 U.S.C. § 3583(e)(3), the court may revoke supervised

release and impose a term of incarceration of up to two years. In addition, it may order a new term of supervised release to follow such incarceration. 18 U.S.C. § 3583(h). But the new term of supervised release, together with the term of incarceration, cannot exceed the authorized original maximum period of supervised release allowed by statute. *Id.*

The United States Sentencing Commission has issued policy statements for revocation of supervised release. These policy statements are advisory and non-binding. *United States v. Anderson*, 15 F.3d 278, 285–86 (2d Cir. 1994). Ilayayev was charged with and pleaded guilty to a grade "C" violation as defined by U.S.S.G. § 7B1.1(a)(3). Upon a finding of a grade "C" violation, the court may revoke supervised release and impose custody or extend or modify the existing term of supervised release under U.S.S.G. § 7B1.3(a)(2). Since a criminal history category of III was found applicable at the original sentencing, the guidelines range for the term of custody is five to eleven months. *See* U.S.S.G. § 7B1.4(a). The minimum term of custody may be satisfied by a custody term of as little as one day followed by supervised release with a special condition of community confinement or home detention for the balance of the minimum term. *See* U.S.S.G. § 7B1.3(c)(1).

Ilayayev's supervised release was revoked and he was sentenced to a term of custody of one day. A term of two years' supervised release was imposed with the special condition that he participates in an inpatient drug treatment program as directed by the Probation Department. Central to the court's decision was the fact that an outpatient treatment program had not succeeded, addiction to multiple drugs continued, and the defendant appeared to be consorting with persons using drugs, raising the substantial concern that he would return to drug dealing to support his habit.

The court considered the "nature and circumstances of the offense and the history and characteristics of the defendant." *See* 18 U.S.C. § 3553(a)(1). Since Ilayayev's term of supervised release commenced on June 13, 2007, he has incurred four violation charges. The circumstances of each violation charge have been detailed earlier in this memorandum. S*ee* Part II.B.iv, *supra*. These violations include allegations of continued drug use and a strong suspicion of committing new crimes involving drugs.

Ilayayev's conduct over the past four years that he has been on supervised release has demonstrated his inability to gain control over his drug addiction by outpatient treatment. He has been afforded numerous opportunities to help cure himself with the assistance of several drug treatment programs—both inpatient and outpatient—but has repeatedly failed to benefit. The Probation Department has found that he has been unable or unwilling to report as directed for random urine testing, making it impossible for it to determine whether he continues to abuse and sell drugs.

In light of Ilayayev's dangerous recidivist tendencies, the sentence imposed is necessary. It reflects the seriousness of the offense and will promote respect for the law and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). A revocation of his current term of supervised release followed by one day incarceration and a new term of supervised release with the special condition that he enters an inpatient drug treatment program will substantially restrict his freedom. Probation officers charged with Ilayayev's supervision, skilled in dealing with available drug treatment programs and addicts such as Ilayayev, believe that this defendant can be cured of his addiction given the program to which he will be subject. The alternative of a sentence to incarceration under these circumstances can be avoided without substantial danger to the defendant or the public.

## VIII.  Conclusion

Where drug addiction of the defendant is causatively intertwined with a violation of the criminal law, every effort should be made to minimize incarceration in favor of a closely supervised, intensive medical treatment regime outside of prison.  Outpatient treatment is preferred, permitting the defendant to be more readily integrated into a drug-free productive lifestyle in the community.

Where outpatient treatment fails and defendant continues to use drugs, he should be confined to an available non-incarcerative in-patient treatment facility.

Every effort should be made to avoid incarceration.  According to the experience of the court's probation services and experience of its judges, prison appears to increase the likelihood of: inability to conform to community standards, continued use of drugs to help assuage the pains of failure, ostracism, the risks of complicating psychiatric problems, and the difficulty in obtaining a job.  *See Bannister*, --- F. Supp. 2d at ---, 2011 WL 1361539 at *32–34 (describing the adverse consequences incarceration has on the life of a criminal once released from prison) (citations omitted).

Jack B. Weinstein
Senior United States District Judge

Dated: August 5, 2011
      Brooklyn, New York